1                     UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF INDIANA
2                       HAMMOND DIVISION

3  UNITED STATES OF AMERICA,   )
                         )
4    vs.                )  Case No.
                         )  2:20-cr-00007-PPS-JEM
5  LORENZO JOHNSON,         )
                         )
6       Defendant.       )
   _____ )

7

8                   **SENTENCING HEARING**
                   **DECEMBER 17, 2021**
        **BEFORE THE HONORABLE PHILIP P. SIMON**
9            **UNITED STATES DISTRICT COURT**

10  <u>APPEARANCES:</u>

11  FOR THE GOVERNMENT:      EDUARDO A. PALOMO - AUSA
                       U.S. Department of Justice
12                    Criminal Division
                       1301 New York Avenue NW, Room 715
13                    Washington, DC 20530
                       202-579-5738
14                    Fax: 202-514-1793
                       Email: eduardo.palomo2@usdoj.gov
15

16                    MOLLY ANNE KELLEY - AUSA
                       U.S. Attorney's Office - Ham/IN
17                    5400 Federal Plaza, Suite 1500
                       Hammond, Indiana 46320
18                    219-937-5500
                       Fax: 219-852-2770
19                    Email: molly.kelley2@usdoj.gov

20

   FOR THE DEFENDANT:       ADAM TAVITAS
21                    Law Office of Adam Tavitas
                       751 East Porter Avenue, Suite 3
22                    Chesterton, Indiana 46304
                       219-677-9220
23                    Fax: 219-972-7110
                       Email: Adtavitas@aol.com
24

25

```
 1
    PROBATION:                Abby Wichlinski
 2                            and Troy Sabourin, USPO

 3  ALSO PRESENT:             Defendant, Lorenzo Johnson

 4
    OFFICIAL REPORTER:        Angela Phipps, RMR, CRR
 5                            5400 Federal Plaza
                              Hammond, Indiana 46320
 6                            (219) 852-3616
                              angela_phipps@innd.uscourts.gov
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  Proceedings reported by stenotype.  Transcript produced by

25  computer-aided transcription.
```

1      (The following proceedings were held in open court,

2      commencing at 10:26 a.m., reported as follows:)

3      (Call to order of court.)

4      **THE COURT:**  You can be seated.

5     We're on the record this morning in *United States vs.*

6  *Lorenzo Johnson*.  Mr. Johnson is here today with his lawyer,

7  Mr. Tavitas.  We have Ms. Kelley and Mr. Palomo here for the

8  Government.

9     The Defendant was found guilty a number of months ago--

10  let me get the exact date --on August 16th of this year by a

11  jury on five counts of the seven-count Indictment.  In

12  particular, he was found guilty of Counts One, Two, and Three

13  and Counts Six and Seven.  Of course, the other counts were

14  related to another defendant.

15     So he was adjudged guilty on his plea, and we ordered the

16  preparation of a Presentence Report, which I got on 11/30 of

17  '21, from Ms. Wichlinski.  I have studied the Report and the

18  Addendum.  I also received a Sentencing Memorandum from the

19  Government and some other filings that we will talk about here

20  in a minute, as well as a Motion for Preliminary Order of

21  Forfeiture.

22     So that's all of the material that I have reviewed in

23  advance of the hearing today to get prepared.

24     Mr. Tavitas, does that sound like what I have before me

25  for purposes of sentencing?

1          **MR. TAVITAS:**  Yes, Your Honor.

2          **THE COURT:**  All right.  Who can I talk to here today?

3          **MR. PALOMO:**  Me, Your Honor.

4          **THE COURT:**  All right.  Mr. Palomo, does that sound

5     like the universe of material I have before me for my

6     consideration?

7          **MR. PALOMO:**  Yes, Your Honor.

8          **THE COURT:**  All right.  So, Mr. Tavitas, can I assume

9     that you've had a chance to sit down with Mr. Johnson and

10    thoroughly review the contents of the Presentence Report

11    sometime before the hearing today?

12         **MR. TAVITAS:**  We have, Your Honor.  Probably -- I

13    know in the last couple weeks, I've seen Lorenzo, like, two or

14    three times, not only going over the presentence, but obviously

15    another matter that the Government had given to my attention as

16    well as for the forfeiture as well, Your Honor.

17         **THE COURT:**  Okay.  Is that all true, Mr. Johnson; did

18    you have a chance to talk to your lawyer about the contents of

19    the Presentence Report as well as those other issues?

20         **THE DEFENDANT:**  Yes, sir.

21         **THE COURT:**  All right.  And, Mr. Palomo, I assume

22    you've had a chance to thoroughly review the Presentence

23    Report; is that right?

24         **MR. PALOMO:**  Correct, Your Honor.

25         **THE COURT:**  Okay.  Now, according to the Addendum in

1  the Presentence Report, there are some factual issues that need

2  to be resolved.  Does the Addendum accurately identify what is

3  in dispute between the parties?

4     Mr. Tavitas?

5           **MR. TAVITAS:**  It does, Your Honor.

6           **THE COURT:**  Mr. Palomo?

7           **MR. PALOMO:**  Correct, Your Honor.

8           **THE COURT:**  Would you agree that everything else in

9  the Presentence Report that's not identified in the Addendum as

10  being in dispute, is everything else materially accurate?

11          **MR. PALOMO:**  Yes, Your Honor.

12          **MR. TAVITAS:**  It is, Your Honor.

13          **THE COURT:**  Okay.  So before we dive into the

14  Addendum and resolve those objections, let me just first ask:

15  Am I going to hear any victim allocution here today; any of the

16  witnesses want to be heard?

17          **MR. PALOMO:**  No, Your Honor.  We did submit to the

18  Court a victim impact statement, though.

19          **THE COURT:**  Yeah.  Do you have a copy of it?

20          **MR. PALOMO:**  Yes, Your Honor.

21          **THE COURT:**  Would you mind providing me a copy of it.

22  I'm very sorry.  I had not had a chance to read that, and I

23  want to read it right now.  I know it was given to me just as I

24  walked in, and then I forgot to read it on my way out here

25  because it was just filed last night, and I've been at a

1  doctor's appointment this morning.

2       (Document tendered to the Court.)

3       Thank you.  So just give me one minute to read this.

4       Can you tell me who the author of this is, Mr. Palomo.

5  Because it's redacted.

6            **MR. PALOMO:**  Pardon me, Your Honor?

7            **THE COURT:**  Can you tell me the author of this.

8            **MR. PALOMO:**  This would be the guardian for Jane Doe,

9  who is the victim of Count Two, I believe.

10           **THE COURT:**  Which of the three women is it associated

11 with?

12           **MR. PALOMO:**  This would be the victim for the Jasmine

13 Stanley count, Your Honor.

14           **THE COURT:**  Got it.  Okay.

15      (Brief pause.)

16      Okay.  Thank you.

17      Before we get into the objections, there was a Preliminary

18 Order of Forfeiture, and I think I neglected to ask at trial

19 whether or not there was going to be any objection if the

20 Defendant was found guilty.  Ordinarily, my practice is to ask

21 the Defendant and his lawyer whether there's going to be a

22 dispute about the forfeiture; and, of course, he has a right to

23 a jury trial on the forfeiture, and I ordinarily ask the

24 Defendant whether they are going to demand their right to the

25 jury trial on the forfeiture in the event of a conviction.  I

1 believe I neglected to do that here in this case for reasons I

2 don't recall.  Probably because I just forgot about it.  But in

3 all events, there is an effort here by the Government to

4 forfeit what amounts to a bunch of, I think, cellphones and

5 maybe other computer equipment.  Is that right, Ms. Kelley?

6       **MS. KELLEY:**  As well as a firearm and ammunition,

7 Your Honor.

8       **THE COURT:**  That's right.  So are you going to have

9 any objection to the forfeiture of those items, Mr. Tavitas?

10       **MR. TAVITAS:**  No, Your Honor.  It is my recollection

11 that, prior to -- while the jury was deliberating, that the

12 forfeiture question did come up.  And so then I went and spoke

13 with Mr. Johnson in that -- in the event that there was a

14 conviction, would we waive forfeiture.  And we indicated to the

15 Court that we would.  In addition, the motion for forfeiture

16 that was recently filed, I did review it with Mr. Johnson, and

17 we have no issue with that, Your Honor.

18       **THE COURT:**  All right.  Is that all true,

19 Mr. Johnson?

20       **THE DEFENDANT:**  Yes, sir.

21       **THE COURT:**  Okay.  So I will order the forfeiture as

22 part of my sentencing order here when we get to that.

23     And, Ms. Kelley, can you give me a copy of that

24 forfeiture --

25       **MS. KELLEY:**  Yes, Your Honor.

1    **THE COURT:** I know you provided it, but for reasons

2 with this COVID, and I have law clerks working at home, and

3 that's not anybody's fault but it --

4    **MS. KELLEY:** It probably was --

5    (Document tendered to the Court.)

6    **THE COURT:** No, that's fine. I just want to be able

7 to get exactly what the language is. This was sent to me, but

8 I failed to print it out. So it's nobody's fault but my own,

9 but I want to have the exact item of property so I can read it

10 into the record.

11    Okay. Again, before we get to the objections, I wanted to

12 cover one other area.

13    On December the 3rd, the Government filed, frankly, an odd

14 motion. It was seeking a protective order for something before

15 actually producing it to the Defense and providing it -- Well,

16 they provided it to the Court, but it was an ex parte request

17 for a protective order. I wasn't comfortable with that kind of

18 procedure, so I simply ordered the production of the underlying

19 material that's laid out in Document No. 111, but also

20 immediately ordered its protection by virtue of a protective

21 order. And I've been told that the Government has complied

22 with that request and the material was, in fact, disclosed to

23 Mr. Tavitas; again, the material contained in Document No. 111.

24    Is that true, Mr. Tavitas?

25    **MR. TAVITAS:** It is true, Your Honor. On

1    December 6th, I received a letter from the Government

2    regarding the specific -- the *Giglio* as far as -- in the

3    protective order.  And this particular document, I was able to

4    show it to Mr. Johnson.  We were actually at the Hammond Jail.

5    There's a glass partition, but I was able to show him.  It's a

6    two-page document, and I was able to show him both pages, and

7    we were able to review it together.

8    **THE COURT:**  And just without getting into the details

9    of it because it's under seal, in a summary way, it deals with

10    potential *Giglio* material as it relates to two of the agents in

11    that case; is that right, Ms. Kelley, just for the record?

12    **MS. KELLEY:**  Yes.

13    **THE COURT:**  And, Mr. Tavitas, did you have a chance

14    to fully discuss this with your client and what, if anything,

15    you're going to do with it?

16    **MR. TAVITAS:**  I have, Your Honor.  Not only after

17    getting this produced.  I have -- I did have a discussion with

18    Mr. Johnson.  Also had a discussion with Mr. Johnson earlier

19    today, as well.  Based on this material, this disclosure,

20    Mr. Johnson wanted me to orally request a motion for a new

21    trial.

22    He believes that his trial -- he was prejudiced by not

23    having this information given to us prior to trial and that he

24    believes that the jury should have been aware of the contents

25    that's in the protective order.  And for that reason,

1  Your Honor, we would orally move for a motion for a new trial

2  in this matter.

3          THE COURT:  This is different from what I was

4  expecting, frankly.  I mean, if you want to file a motion for a

5  new trial, file a motion for a new trial and support it with

6  how you would have used it, how it would have been germane to

7  something, you know, would it have been admissible, what's the

8  law governing, et cetera.  Instead, you're simply making an

9  oral motion that's not, sort of, necessarily well-supported.

10     I have no idea how this could have been used in a trial.

11  I haven't gone back -- Because there hasn't been a motion until

12  ten seconds ago, I haven't gone back and read the testimony of

13  Agent Robertson or Agent Oakes to see how this information

14  could have somehow been germane to impeaching them; did they

15  say something during their testimony that would have reasonably

16  raised this issue and allowed you to cross-examine on it, you

17  know.  Do you have anything more specific to say about it?

18          MR. TAVITAS:  I do not, Your Honor.

19          THE COURT:  Let me ask you, Ms. Kelley.  In

20  paragraph 2 of your motion, you say that the agents did not

21  disclose this information and what I -- There was some

22  ambiguity to that to me.  Was that saying they didn't disclose

23  the information, the subject information, during your interview

24  with them or during trial, while they testified?

25          MS. KELLEY:  In our motion we were referring to the

1  pretrial discussions with the agents.

2      **THE COURT:**  I see.  And so you had asked them during

3  your pretrial interview whether there was anything that would

4  undermine their objectivity in the case, essentially?

5      **MS. KELLEY:**  Yes, Your Honor.

6      **THE COURT:**  And they both said no?

7      **MS. KELLEY:**  That's correct, Your Honor.

8      **THE COURT:**  And possibly this information that they

9  didn't disclose could bear on that; that's the reason you've

10  disclosed this?

11      **MS. KELLEY:**  Yes.  Essentially.  Yes, Your Honor.

12      **THE COURT:**  I guess, Mr. Tavitas, how would you have

13  used this at trial?  I want to make a record here.  If we're

14  going to do this, we're going to do it.  Otherwise, I'm going

15  to suspend the hearing and force you to file a motion instead

16  of just dumping this in my lap and expecting me to make some

17  ruling by the seat of my pants.

18      **MR. TAVITAS:**  I understand, Your Honor.

19      **THE COURT:**  That's not how it works, and it's a

20  little unfair to the Court.

21      **MR. TAVITAS:**  I understand that, Your Honor, and I do

22  apologize.  I did go over, when I did get this letter, and I

23  showed it to Mr. Johnson, and I indicated that I had gone over

24  with the transcripts, and I gave my opinion to Mr. Johnson as

25  if -- if this information had been disclosed and if it would

1  have been potentially allowed at trial.  I gave Mr. Johnson

2  that particular opinion.  But even after giving that opinion,

3  again, Mr. Johnson this morning asked -- was asking me to

4  orally make that request that I made.  So, again, I do

5  apologize to the Court.

6           **THE COURT:**  All right.  I don't know what else to say

7  other than to say I deny the motion for a new trial based upon

8  its barebones nature.  It's not well-conceived.  It hasn't been

9  explained to me.  I haven't been shown how this information

10  would have been used.  The information seems entirely

11  irrelevant to anything that took place during this trial as far

12  as I can tell, and I can conceive of no way it would have been

13  used by the Defense during the course of the trial, whether

14  that be in general or, in particular, cross-examination of

15  either of these witnesses; and in the absence of a more

16  particular motion telling me why what I just said is incorrect,

17  the motion is denied.

18      Is there anything else to say about that?

19           **MR. PALOMO:**  Not about that, Your Honor.  I did

20  neglect earlier to discuss restitution.

21      We have received restitution requests from the victims,

22  but we have not yet received materials supporting those

23  requests.

24           **THE COURT:**  Okay.

25           **MR. PALOMO:**  And we would ask the Court to delay a

1  restitution order for a period of up to 90 days.

2          **THE COURT:**  You have 90 days; right?

3          **MR. PALOMO:**  Yes, Your Honor.

4          **THE COURT:**  Fair enough.  I won't speak to

5  restitution today because nothing has really been presented to

6  me; but, of course, the statute allows that process to be

7  delayed for 90 days, and I'll await hearing from the Government

8  in that regard.  Okay?

9          **MR. PALOMO:**  Yes, Your Honor.  Thank you.

10          **THE COURT:**  Okay.  So we are on page 1 of the

11  Addendum.  The first objection is really a wholesale objection.

12  It's to all of paragraphs 4 through 26 of the Presentence

13  Report and then paragraphs 28 and 29, as well.

14     Do you want to be heard on this?

15          **MR. TAVITAS:**  Your Honor, other than what's in the

16  objections, again, I understand, obviously we went to trial.

17  Mr. Johnson maintained his innocence.  And so I just wanted to

18  make those particular objections.  I've got nothing else to add

19  to that, Your Honor.

20          **THE COURT:**  Did you have anything to say, Mr. Palomo?

21          **MR. PALOMO:**  The Government stands by its responses

22  to those objections, Your Honor.

23          **THE COURT:**  The objections are overruled.  The jury

24  made the findings that they found; and the factual allegations

25  that are set out in paragraphs 4 through 26 and paragraphs 28

1  and 29, I believe, are well supported by the evidence, as

2  detailed in the Presentence Report.  Other than a wholesale

3  objection, I'm not really being presented any argument as to

4  why I should not simply adopt the Presentence Report.  It's not

5  enough to simply say that something is inaccurate.  You have to

6  be specific, and it needs to be well supported.  And, actually

7  on the contrary, the Presentence Report is drafted by

8  Ms. Wichlinski.  I think she's done an excellent job at fairly

9  capturing what the evidence was that was presented at trial.

10 And so the objection is overruled.

11     I suppose the same applies to paragraphs 39 and 49.  This

12 is whether or not the enhancements for distribution under the

13 Guidelines should be applicable.  But I'll give you an

14 opportunity to be heard on that, Mr. Tavitas.

15          **MR. TAVITAS:**  Nothing else to add, Your Honor.

16          **THE COURT:**  How about you, Mr. Palomo?

17          **MR. PALOMO:**  We stand by our response to the

18 objection, Your Honor.

19          **THE COURT:**  Okay.  I overruled the objection.  I do

20 believe that there is really overwhelming evidence that the

21 Defendant knowingly engaged in distribution, as its found in

22 paragraphs 39 and 49 of the Presentence Report and as it's

23 detailed in the Presentence Report.

24     And to repeat, a general denial doesn't suffice.  We need

25 some specificity; and in the absence of any kind of

1  specificity -- I sat through the trial.  I think Abby has done

2  an admirable job of detailing the facts and the evidence that

3  was presented at trial; that the jury found beyond a reasonable

4  doubt the Defendant did engage in distribution; and of course,

5  right now we're operating under a preponderance standard.  And

6  so that objection must be overruled.

7       Paragraphs 41 and 51, the Defendant objects to whether or

8  not there was a knowing misrepresentation of his identity in

9  the effort to persuade or induce, you know, the conduct at

10 issue here.

11      And so do you want to be heard on this, Mr. Tavitas?

12           **MR. TAVITAS:**  Nothing else to add, Your Honor.

13           **THE COURT:**  Anything else from you?

14           **MR. PALOMO:**  Just that this was -- This

15 misrepresentation of his identity, Your Honor, was

16 indispensable means by which he committed these crimes.

17           **THE COURT:**  Yeah.  That's precisely right.  There's

18 no question that the evidence is overwhelming, frankly, that

19 the Defendant was, in fact, Ashley Campbell; that's who he was

20 purporting to be when he was engaging in much of the activity

21 that played out during the trial.  And so the finding that

22 2G2.1(b)(6) is applicable follows from that factual finding as

23 I see it; and so the objection is overruled.

24      The last objection is really more, I suppose, of -- I

25 guess it's both a factual and a legal objection.  But I'll hear

1    from you now on that, Mr. Tavitas.

2           **MR. TAVITAS:**  Your Honor, again, I have nothing else

3    to add other than what was presented in the objection.

4           **THE COURT:**  Can you take me through the analysis on

5    this one, Mr. Palomo.

6           **MR. PALOMO:**  Yes, Your Honor.

7           **THE COURT:**  This is unrelated to his prior

8    conviction; right?

9           **MR. PALOMO:**  It's still related to his prior

10   conviction, Your Honor, but the prior conviction triggers a

11   different portion of 4B1.5.

12      Walk me through that.

13          **MR. PALOMO:**  Yes, Your Honor.  So 4B1.5(b) applies,

14   4B1 --

15          **THE COURT:**  Hang on.  Let me get caught up with you

16   here by actually looking at the Guideline.

17      (Brief pause.)

18      Okay.  I'm with you now.  Okay.  The prior is, of course,

19   relevant because the instant offense was committed subsequent

20   to his prior; is that what you're saying?

21          **MR. PALOMO:**  Yes, Your Honor.  But not just that.

22          **THE COURT:**  Right.

23          **MR. PALOMO:**  So in footnote 6 of the Government's

24   Sentencing Memorandum, we lay out why subsection (a) doesn't

25   apply, because his prior conviction under the categorical

1  standard doesn't trigger application of subsection (a).

2  However, subsection (b) comes into play for a pattern of sexual

3  offenses against minors, including the prior 2008 offense and

4  the offenses of conviction for Counts One, Two, and Three.

5      So all of those taken together constitute the pattern of

6  sexual abuse against minors, Your Honor.

7          THE COURT:  Maybe I'm not clear, but why is the prior

8  a qualifying sex crime for (b) but not for (a)?

9          MR. PALOMO:  For (b), it doesn't require application

10  of the categorical approach, Your Honor.  So that's the

11  distinction there.

12      And also subsection (a) operates a bit differently with

13  respect to applying a different criminal history category;

14  whereas, subsection (b) applies a five-point increase.

15      So there's a bit of difference both in terms of the

16  threshold and in terms of application on the back end of how

17  the enhancement works.

18          THE COURT:  In all events, this adds five levels to

19  the guidelines; correct?

20          MR. PALOMO:  Yes, Your Honor.

21          THE COURT:  And we are so far above 43 that it

22  becomes somewhat of an academic exercise here; is that true?

23          MR. PALOMO:  Academic in the sense of his raw score.

24  But still for recordkeeping purposes for the Sentencing

25  Commission, to reflect accurately the Defendant's crimes and

1  his history, the Court should apply that enhancement,

2  Your Honor.

3      **THE COURT:**  I'm not minimizing it in the least.  What

4  I'm saying is that, as far as calculating where he falls in the

5  guidelines, whether this applies or not, he's going to be a

6  Level 43; is that correct?

7      **MR. PALOMO:**  That's correct, Your Honor.

8      **THE COURT:**  I do overrule the objection.  I do think,

9  notwithstanding what I have just said, I do think that 4B1.5(b)

10  does apply; and the five-level enhancement is applicable for

11  the reasons stated in the Government's response, on pages 2

12  and 3 of the Addendum, that by virtue of the Defendant's prior

13  conviction as well as the conviction in this case of the three

14  co-conspirators in the production of child pornography as it

15  relates to those, that, combined, it does amount to a pattern

16  of activity involving prohibited sexual conduct.  And,

17  therefore, 4B1.5(b) applies; and the objection is, therefore,

18  overruled.

19      Okay.  Anything else that I need to resolve as it relates

20  to the objections, Mr. Tavitas?

21      **MR. TAVITAS:**  No, Your Honor.

22      **THE COURT:**  All right.  How about you, Mr. Palomo?

23      **MR. PALOMO:**  No, Your Honor.

24      **THE COURT:**  All right.  I do now adopt the factual

25  statements contained in the Presentence Report as my own

1  findings of fact, and I also adopt Probation's conclusions as

2  to the applicable guidelines.

3      And so I will state that the guidelines are as follows:

4  There's a total offense level of 43.  The criminal history

5  category is I.  And under the Guidelines, that suggests a life

6  sentence as the recommended sentence.

7      Supervised release is five years on Counts One through

8  Three and Six, and it's one to three years on Count Seven.  The

9  fine range is $50,000 to $250,000.  Restitution will be

10  determined at a later proceeding, or in a later proceeding.

11  And there is a $500 special assessment, $100 on each count,

12  that the Defendant is accountable for.

13      So based on all the rulings that I've made, is that all

14  accurate?

15      Mr. Tavitas?

16          **MR. TAVITAS:**  It is, Your Honor.

17          **THE COURT:**  Mr. Palomo?

18          **MR. PALOMO:**  That's correct, Your Honor.

19          **THE COURT:**  Okay.  All right.  So, Mr. Tavitas, as

20  the lawyer for the Defendant, is there anything that you wish

21  to say on his behalf before I sentence him?

22          **MR. TAVITAS:**  Your Honor, these are tough situations

23  which obviously after, you know, going -- you know, going

24  through -- I think it was a four- or five-day trial and seeing

25  the evidence that was presented -- You know, I've been on this

1  case for almost two years, and, you know, I've talked with

2  Mr. Johnson often.  His mom and his sister are present.

3  They're very nice individuals, Your Honor.  You know, I talked

4  with them before trial and even after trial.  So I know

5  Mr. Johnson -- I know he's very appreciative of them being

6  here.  I know sometimes it's -- it's a pretty lonely -- I can

7  only imagine, lonely feeling sometimes having clients -- when

8  you're facing a sentence, especially a significant sentence,

9  and being all by yourself.  And so I do know that he is

10  appreciative of them being here.

11      Your Honor, obviously, you know, in these types of cases,

12  you know, the guidelines go through the roof, right?

13  Mr. Johnson is looking at a potential life sentence.  He

14  obviously has a mandatory minimum of 25 years, and that's what

15  we're asking the Court to sentence him.

16      He's 33 years old.  Does have six dependents.  He has been

17  incarcerated two years on this particular matter.  As you did

18  indicate, he does have a criminal history score of I.

19      So for all those reasons, Your Honor, we're asking the

20  Court to sentence him to the least amount of time, and that's

21  being 25 years.

22      One other request, Your Honor, is that his sister had

23  indicated that, in speaking with Mr. Johnson, asking to make a

24  recommendation to the BOP.  There's a facility called Sandstone

25  in Minnesota.  I did advise Mr. Johnson the Court will

1  obviously just make the recommendation and it's up to the
2  Bureau of Prisons to decide.  But that is where he indicated
3  where he wanted to be placed, as well as obviously get the
4  credit for time he's been incarcerated since this case was
5  filed.
6      Thank you.
7          **THE COURT:**  Okay.  Thank you, Mr. Tavitas.
8  Mr. Johnson, do you wish to say anything on your own
9  behalf, sir, before I sentence you?
10          **THE DEFENDANT:**  Yes.
11          **THE COURT:**  Sure.
12          **THE DEFENDANT:**  I really wasn't going to say
13  anything, but I just wanted to -- I felt like I needed to speak
14  today because it's kind of -- I'm like a mute, kind of, without
15  addressing things.
16      But every night, like, I pray.  I ask for forgiveness
17  because I feel that I could have made better decisions and
18  choices to prohibit certain situations that happened with this
19  case.  I honestly just wanted to have a fair trial and a fair
20  chance and presenting, you know what I'm saying?
21      Not saying I'm a hundred percent innocent on everything.
22  But I just wanted to take responsibility for the things that I
23  did do, and I wanted to fight for innocence for the things I
24  felt I did not do and which I just feel it wasn't done.  But I
25  went through a jury, and I was found guilty through a jury.

1     But, you know, I apologize for my actions for the things

2  that I did, did, and I do take responsibility for those things,

3  and it's unfortunately me being accused of the things I didn't

4  do.  But we're not going to get into that because, you know,

5  we're past it.

6     But I do have children, you know, that depend on me.  And

7  I also, you know -- you know, I love my children.  And even

8  other children in my family and everything, I take pride into

9  being that example for them.  And I would never intentionally

10  harm anyone, especially someone of the age of this case, and I

11  would never intentionally try to victimize anyone because

12  that's not my character, and it's never been my character.  I

13  do have a background of a felony from something that happened

14  when I was 19.  And it just kind of feel like that's what's

15  being held against me, from that mistake that I made then.  But

16  I am apologetic, and, you know, I feel horrible for the people

17  that was victimized in this situation.  And, like I said, I

18  wanted a chance to take responsibility for my doings and just

19  fight for the things that I didn't do.

20         **THE COURT:**  Okay.  I appreciate that.  Thank you,

21  Mr. Johnson.

22     Mr. Palomo, do you want to be heard, sir?

23         **MR. PALOMO:**  Yes, Your Honor.

24     Dominique Harper had children that depended on her, too.

25  Kelsie Gauler had children that depended on her.  Those

1   children aren't going to have their parents anymore.

2      In Dominique Harper's case, she'll get out of jail one

3   day, return to her children's lives.  Kelsie Gauler won't.

4      When Defendant sent a message to somebody that he had

5   never met on Facebook saying, "Do you want to make $2,000," he

6   did this with the intent of persuading these people, who had

7   never met him once before, didn't even know that he existed,

8   with the intention of having them produce child pornography,

9   child pornography involving their own children.

10      So now John Doe Three gets to wake up this morning and get

11   ready for his day the way that other four-year-old children do.

12   He eats his breakfast, brushes his teeth.  But his mom is

13   sitting in jail today because this man persuaded her to do

14   something that wasn't actually in her nature.  She needed

15   money, and she made a terrible criminal choice to sexually

16   abuse her child at his direction.

17      Kelsie Gauler.  John Doe One and Two, her children, who

18   were four and six at the time of these offenses, now a couple

19   years older, they're getting ready to go to first and third

20   grades, packing their lunches, going to school like other kids,

21   except the difference is that they'll never see their mother

22   again.  On March 15th, she committed suicide, before this

23   trial.  And there are a lot of things that go into that.  But

24   he's to blame for part of it, because if she had never had this

25   man drop into her life, maybe she'd still be here today.  Maybe

1  her children would have a mother to call to help them get ready

2  in the morning for school.

3      That's why these crimes are serious.

4      This isn't a normal child pornography -- as if any child

5  pornography offense is normal.  This is a strange outlier.  Did

6  this man persuade these women to create these images for his

7  own sexual gratification?  The messages presented at trial show

8  that he did.  When he sends messages like, "Are you going to

9  jack it off or suck it," talking about John Doe One's penis, an

10 infant, why did he write that but for some purpose of sexual

11 gratification?  There was certainly an element of that in this

12 case.  But this is deeper, different, more sinister.

13      The reason he was trying to get these images from theses

14 women wasn't just because he got sexual gratification from

15 them; it was to blackmail them.  And this is the most

16 perplexing part.  For what?  Why do these crimes?  Why reach

17 out to these women and offer them $2,000 and then distribute

18 child pornography to them to normalize that criminal conduct so

19 that you can get images of their kids?  And for what?  So that

20 you can blackmail them, try to get money out of them, persuade

21 them to have sex with you?

22      These women's lives, these co-conspirators, and their

23 children, their lives are utterly ruined because of this.  The

24 seriousness of this offense is almost mind-boggling.

25      Now, in view of the guidelines, these guidelines

1   accurately account --

2           THE COURT:  Have those two moms been sentenced yet?

3           MR. PALOMO:  Not yet, Your Honor.

4           THE COURT:  What are they looking at?

5       MR. PALOMO:  Dominique Harper pleaded guilty to

6   transportation of child pornography without a plea agreement

7   setting a range.  So her minimum is going to be five years with

8   a maximum of 20.

9       Jasmine Stanley's sentencing proceeding will happen on

10  December 21st, Your Honor.  She'll change her plea on

11  December 21st.  She's currently charged with one count of

12  production of child pornography.

13          THE COURT:  That's also in Chicago?

14          MR. PALOMO:  Yes, Your Honor.

15          THE COURT:  Such an odd case.  They're both victims

16  and co-conspirators.  It's really odd.

17          MR. PALOMO:  And the Government doesn't want to

18  minimize their role in this.  They produced these images.  They

19  are the hands-on abusers of these children.  They deserve to be

20  punished for their role in these crimes.  But the first mover,

21  the but-for cause here, is sitting in this courtroom (pointing

22  to Defendant).  If he would have been doing anything else,

23  bowling, managing his D.J. business or his entertainment

24  business, doing something else productive with his time, we

25  wouldn't be here today.  Potentially some of these children

1   would be spending time with their mothers now.

2       But we're not.  And if we view this in the context of, not

3   just the Sentencing Guidelines, which gives us a number that's,

4   frankly, really high -- It recommends a life sentence.  But the

5   reason that the Government is recommending 50 years is in view

6   of the 3553(a) factors.  The very serious and just perplexing

7   and -- It's so hard to wrap your head around why this man did

8   these things.  And then if you view that against the

9   unspeakable harm that he's caused through it, you're looking at

10  one of the more serious offenses that I can think of,

11  Your Honor.

12      Now, if you look at his history, there's really nothing in

13  his history that could even come close to mitigating this.  He

14  didn't have the same kind of privilege that other Defendants

15  may have or that other people in society might have, but his

16  childhood also wasn't riddled with the kind of abuse that would

17  potentially make him a little less culpable.  He went into this

18  with his eyes open.  He knew what he was doing, especially

19  because in 2008 he was convicted of a sex offense.  He had to

20  register as a sex offender; he had been through the system

21  before; and he knew he shouldn't be doing these things.

22      As the Court recalls from the evidence presented at trial,

23  some of his communications with his co-conspirators included

24  statements of, "You know how illegal this is.  I have buddies

25  on the force.  If we get caught doing this, we're in big

1    trouble."  And that's precisely what he used as a threat

2    against these other women.  "I'll expose you."  Expose you for

3    what?  "Stuff that I know is illegal, not just illegal, but

4    highly illegal.  If I expose you, your life is ruined."  Well,

5    their lives were ruined anyway.

6         That's why a 50-year sentence is appropriate here.  In

7    view of his history and characteristics, anything less than a

8    50-year sentence would be insufficient to address the

9    seriousness of the conduct in view of his history.

10        And then you talk about rehabilitation, specific

11   deterrence, and just protecting the public from this man.

12        The public is not safe if he's not in jail.  If he's not

13   in prison, he'll find a way to victimize other people.  He

14   didn't just do it twice, in 2008 and then for these offenses.

15   He did it in 2008 and over a period of approximately

16   five months in 2019.  This was protracted, premeditated conduct

17   on his part to get these images from these women.

18        A sentence of 50 years is appropriate, Your Honor, and we

19   ask that you sentence him to that term of imprisonment,

20   followed by a lifetime of supervised release.

21        **THE COURT:**  Okay.  Thank you, Mr. Palomo.

22        All right.  Mr. Johnson, in this case, as in any case,

23   it's my obligation to try to weigh the aggravating and

24   mitigating circumstances and arrive at a fair sentence; and I

25   do that through a prism of various factors that I have to take

1 into account.

2      The starting place in any sentencing hearing is:  What do

3 the Sentencing Guidelines suggest.  You know, I start there,

4 and then I start looking at other factors as well that are just

5 as important as the Sentencing Guidelines.  And through that

6 process, the goal is to arrive at a sentence that is sufficient

7 but not greater than necessary to reflect all of the factors at

8 issue.

9      And so in addition to the Sentencing Guidelines, I have to

10 look at the nature and circumstances of the offense.

11 Obviously, I have to look at what you did that brought you

12 here, the conduct underlying the offense.  That's no surprise.

13 So that's one factor.

14      I have to also look at your personal history and

15 characteristics.  And so as I frequently put it, what I have to

16 do is sentence you both for what you've done, but also for who

17 you are as a person, speaking more broadly.  And who you are as

18 a person-- in other words, your personal history and

19 characteristics --captures a broad range of things.  It can be

20 your criminal history.  It can be your educational background,

21 your employment history, your drug and alcohol use, how you

22 were raised, your family circumstances, your children.  The

23 whole range of things goes in to deciding what are your

24 personal history and characteristics.

25      Of course, I have to, as Mr. Palomo kind of touched upon,

1   I have to, when I announce the sentence, hope that it reflects
2   the seriousness of the offense, that it will promote respect
3   for the law, provide just punishment, as well as deter criminal
4   activity.
5       Deterrence is an important factor.  I mean, some people
6   argue all the time about the usefulness of deterrence.  There's
7   both specific deterrence, trying to prevent you from committing
8   additional crime, but there's also the concept of general
9   deterrence, sending a message to the community about what can
10  happen if you engage in this kind of behavior; and hopefully,
11  it prevents, or deters, others from engaging in this kind of
12  behavior.  And there's other factors, as well.
13      The long and short of it is, this is much more of an art
14  than a science.  It's trying to weigh all of the factors in
15  arriving at a fair sentence.
16      So let's talk about -- First of all, the Guidelines
17  recommend a life sentence, and the Guidelines treat this about
18  as serious as a homicide.  And so I have to pay attention to
19  that and weigh that in my analysis.
20      When I move on to the 3553 factors, you know, the nature
21  of this offense, I scarcely know what to say, as Mr. Palomo
22  states.  I sat here during this trial, and I was mystified.  I
23  didn't understand, on any level, I didn't understand what your
24  motivation was.  You know, were you motivated in really getting
25  pictures, photographs, of very, very young children displayed

1   in a sexual way?  In part, yes.  I mean, there's a very

2   disturbing back-and-forth where one of these co-conspirators

3   sends a picture of their young girl, and they have their legs

4   spread, and the fingers are inserted in the girl's vagina, at

5   your behest.  So somewhere in play here is, perhaps, your

6   interest in that kind of imagery.

7       And yet, on the other hand, there's hints that what's

8   really going on here is that it's actually an extortion scheme,

9   that you are roping these women into engaging with you in this

10  way, sending you these illicit pictures, with the intention of

11  turning around and using it against them in some nefarious or

12  devious way to either get money from them or to extort sex out

13  of them.  It's all a little murky.

14      But it's so disturbing.  It's so disturbing.  Like I said,

15  I scarcely know what to say about it.

16      We're talking about infants in some respect here who are

17  being used as essentially props, or in one view of this,

18  they're sort of props for your gratification, or the other view

19  of it, they're like bait as part of this scheme.  No matter how

20  you look at it, it's just deeply disturbing, and no one could

21  sit through this trial and not come away with that conclusion.

22  It's very sad.

23      Who it's mostly sad for, of course, these children, for

24  starters.  As Mr. Palomo points out, two of these women,

25  because they made the really poor judgment of engaging with

1  you, are now convicted felons.  In all likelihood, they're

2  going to be sent to prison, they're going to be removed from

3  these children, and these children are going to be left to

4  wonder, you know, where's their mom.  And eventually, they're

5  going to find out, eventually, in the age of the internet, and

6  surely they're going to find out what happened here.  And I

7  can't imagine the lifelong kind of burden that that's going to

8  sort of place on their psyche; but to be sure, it will.  And

9  that's a tremendous burden that you've placed on the very

10  slender shoulders of very, very, very young people.

11      And then you talk about the women themselves.  As I said,

12  either because they were desperate or really, really foolish,

13  they engaged in this behavior using their own children or

14  people close to them and participated in this endeavor.  But in

15  all events, they're going to end up in prison.

16      Which brings us to Ms. Gauler.  Perhaps the biggest

17  tragedy of all.  She was a Codefendant in this case.  I think,

18  if I'm remembering correctly, she was set to go to trial, and

19  she was released on bond, you know, earlier in the case.  And

20  she took her own life.  And, surely, the burden of this case

21  and the publicity from the case and the other shame that she

22  likely endured for the behavior she engaged in surely played a

23  role in that.  No one could conclude otherwise.  And that's

24  just a tremendous tragedy.

25      So I don't think there's anything more I need to say about

1    the nature and circumstances of the offense.  It's just about

2    as bad as it gets.  Short of taking someone's life.  And in

3    many ways, that's what the consequences of it was anyway with

4    the result of Ms. Gauler's fate.  Of course, you didn't have

5    any intention of that happening, and I'm not suggesting that,

6    but that was the consequence of it.  So the nature of the

7    offense could hardly get any more serious.

8         When I talk about your personal history and

9    characteristics, of course, you engaged in this terrible prior

10   offense back in 2008.  Evidently, you were working at a high

11   school and engaged the student and engaged in an aggravated

12   criminal abuse of her.  You pled guilty to it and, somewhat

13   unbelievably, received a sentence of probation, I believe, on

14   that prior.

15        That's pretty amazing.  Maybe there were circumstances

16   that I don't fully understand.  I'm not being critical.  I'm

17   just telling you my gut reaction to that.  It doesn't seem

18   right to me.  But it is what happened.  The facts are what they

19   are.  You pled guilty to an aggravated criminal sexual abuse,

20   and that's your background, or part of your background.

21        You have had a number of other -- I'll characterize as

22   very, sort of, minor brushes with the law that don't merit

23   discussion here and don't in any way aggravate the offense as I

24   see it.

25        You had a very tough upbringing.  I fully recognize that.

1  I think, according to the Presentence Report, your dad is

2  presently incarcerated, and your mom, who is here, suffers from

3  a disability.  You were principally raised by your grandma, I

4  believe, or grandparents out in Las Vegas.  But at some point

5  they got just too old, and it became difficult for them, so you

6  were shipped back here.

7      And in the Presentence Report, this struck me very much;

8  that, according to the Presentence Report, your grandma and

9  grandpa must have done somewhat well for themselves.  They were

10 living in a nice environment in Las Vegas that you were living

11 in; but then when you came back here, given your mom's

12 difficult circumstances, you moved to Harvey, and it's a tough

13 environment.  And that juxtaposition kind of struck me, that

14 that would be a difficult thing for a young person to deal

15 with.  And so I recognize that, and I think it's an important

16 thing to talk about, your personal history and characteristics.

17     You do have six children, six children by five different

18 mothers; and, you know, that's certainly a factor that's

19 important in any case, as well as you do have some work

20 history.  It seems you found a way to support yourself despite

21 tough circumstances.

22     So I've done my level best to take into account all of the

23 factors here; and at the end of the day, I think the

24 Government's request is a reasonable one and is what's called

25 out for given all of the factors that I've talked about, and

1    that's the sentence I intend to give.

2        So let me formally announce it, and then I'll give counsel

3    one final chance to make any final comments or make any other

4    objections.

5        But it is the Judgment of the Court, pursuant to Title 18,

6    United States Code, Section 3551 and 3553, that the Defendant

7    is hereby committed to the custody of the Bureau of Prisons for

8    600 months on Counts One through Three, and 480 months on

9    Count Six, and 120 months on Count Seven.  All of those will

10   run concurrent with one another.

11       Defendant will be placed on 15 years of supervised release

12   for Counts One through Three; fifteen years on Count Six; and

13   three years on Count Seven, all to be served concurrent with

14   one another.

15       There will be a number of conditions of supervision that I

16   will talk about here in a minute but --

17       Well, let me just do it now, and let me ask you,

18   Mr. Tavitas.  Have you had a chance to sit down with your

19   client and thoroughly go over the proposed conditions of

20   supervision that are set out in the Presentence Report?  And in

21   the report, it states both the proposed terms and the reasoning

22   behind each of the proposed terms.  Have you had a chance to

23   sit down with your client and do that?

24           **MR. TAVITAS:**  We have, Your Honor.

25           **THE COURT:**  Ordinarily, I'm required to read these

1  officially into the record; but with your permission, I would

2  like to simply incorporate the language of each of these

3  conditions from the report into my comments here today as well

4  as the reasoning behind each one of these to, really, spare me

5  having to officially read these into the record.  Do you have

6  any objection to that procedure?

7              **MR. TAVITAS:**  No, Your Honor.

8          **THE COURT:**  Mr. Johnson, do you have any objection to

9  that yourself?

10            **THE DEFENDANT:**  No.

11        **THE COURT:**  Okay.  All right.  So I will give the

12  four mandatory conditions -- well, actually the five mandatory

13  conditions, that are set out on page 24 of the Presentence

14  Report, Document No. 113.

15     As it relates to the discretionary conditions, I'll give

16  number one, number two.  We're now on page 25 of the report.

17  I'll give number 3, number 4, number 5, number 6, number 7,

18  number 8, number 9, number 10, number 11, number 14, number 15,

19  number 16, number 17, number 18, number 19, and number 20.

20     I will withstand at this point any of the conditions

21  relating to the restitution because we're delaying that issue.

22     I'm going to impose no fine given the Defendant's lack of

23  assets makes it unlikely he will be able to pay a fine.  So the

24  fine is waived.  But he is ordered to pay a special assessment

25  of $500 that's due immediately.

1    The sentence that I've just given is actually below what
2    the guidelines suggest.  I've given the sentence that I've just
3    announced for all the reasons that I have tried to explain in
4    detail on the record.
5    Counsel, do either of you know of any reasons why the
6    sentence should not be imposed as stated?
7    Mr. Tavitas?
8    **MR. TAVITAS:**  No, Your Honor.
9    **THE COURT:**  All right.  Mr. Palomo?
10    **MR. PALOMO:**  No, Your Honor.
11    **THE COURT:**  I will state that, irrespective of
12    whether I have somehow miscalculated the guidelines or erred in
13    the computation of the guidelines in any way, the sentence that
14    I've just announced is the sentence that I would have given
15    notwithstanding that.
16    I can't remember if I just asked this.  Have I taken into
17    account your principal arguments in aggravation and mitigation
18    in my announcement here today?
19    Mr. Tavitas?
20    **MR. TAVITAS:**  You have, Your Honor.
21    **THE COURT:**  Mr. Palomo?
22    **MR. PALOMO:**  Yes, Your Honor.
23    **THE COURT:**  All right.  So I do order the sentence
24    imposed as stated.
25    Mr. Johnson, you've heard the Judgment of the Court

1   imposing sentence upon you; and pursuant to Rule 32(j) of the

2   Federal Rules of Criminal Procedure -- I did forget to include

3   the forfeiture after all that discussion.  So let me also add

4   to the Judgment that the following property is forfeited:

5   Taurus PT140 G2 .40 caliber semiautomatic pistol with the

6   serial number SKM35977, as well as assorted ammunition, as well

7   as five cellular phones.  The first is a Samsung Galaxy J7 Star

8   cellphone, Serial Number R58M50DJ1RL.  Samsung with the serial

9   number J260T1.  An iPhone with serial number DNPYF1M2KXKP, an

10  LG LS777 phone, again, serial number 804CYLH1083072, and then a

11  Motorola XT1921-3 with the IMEI of 351841090366651.  So all of

12  that property is deemed forfeited essentially by agreement of

13  the parties.

14      All right.  Let me go back and just say, Mr. Johnson,

15  you've heard the Judgment of the Court imposing sentence upon

16  you; and pursuant to Rule 32(j) of the Federal Rules of

17  Criminal Procedure, you can appeal your conviction in this

18  case, and you also have a statutory right to appeal your

19  sentence under certain circumstances if you think it was

20  contrary to law.  Any notice of appeal must be filed within

21  14 days of the Judgment being entered in your case.  And if you

22  want to file the appeal but you're unable to pay for the cost

23  of the appeal, you may apply for leave to appeal in forma

24  pauperis, which means you can pursue an appeal at no cost

25  to you.

1      And, of course, Mr. Tavitas, just perfect the appeal.  I'm

2  sure your client will be seeking it, and do so expeditiously.

3  You do remain responsible for the Defendant's representation on

4  appeal unless you are relieved by the Court of Appeals.

5      I will recommend that the Defendant serve his sentence in

6  Sandstone up in Minnesota, and I also recommend, if he wants,

7  participation in the RDAP program given his basic daily drug

8  use, if you think that would be helpful, Mr. Tavitas?

9      (Inaudible discussion off the record between Mr. Tavitas

10      and Defendant).

11      **MR. TAVITAS:**  He indicated that he did not want that,

12  Your Honor.

13      **THE COURT:**  Okay.  Fair enough.  I won't make that

14  recommendation.

15      All right.  Mr. Tavitas, is there anything else we need to

16  talk about today?

17      **MR. TAVITAS:**  No, Your Honor.  Thank you.

18      **THE COURT:**  Mr. Palomo, how about from your point of

19  view?

20      **MR. PALOMO:**  No, Your Honor.

21      **THE COURT:**  Okay.  Thank you all.  Good luck,

22  Mr. Johnson.

23      (Court was adjourned at 11:27 a.m.)

24

25

1      CERTIFICATE OF REPORTER

2            I, Angela Phipps, RMR, CRR, certify that the

3      foregoing is a true, complete, and accurate transcript of

4      proceedings in the above-entitled matter before the Honorable

5      Philip P. Simon, on December 17, 2021.

6

7      Date:  January 11, 2022        S/Angela Phipps, RMR, CRR
                                      Official Court Reporter
8                                     for the U.S. District Court

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25