```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF INDIANA
 2                        HAMMOND DIVISION

 3   UNITED STATES OF AMERICA,    )
                                  )
 4     vs.                        )   Case No.
                                  )   2:20-cr-00007-PPS-JEM
 5   LORENZO JOHNSON,             )
                                  )
 6         Defendant.             )
     _____)   Volume 1 of 4
 7

 8                    DAY ONE OF JURY TRIAL
                         AUGUST 11, 2021
 9             BEFORE THE HONORABLE PHILIP P. SIMON
                   UNITED STATES DISTRICT COURT
10

11   APPEARANCES:

12   FOR THE GOVERNMENT:        EDUARDO A. PALOMO - AUSA
                                U.S. Department of Justice
13                              Criminal Division
                                1301 New York Avenue NW, Room 715
14                              Washington, DC 20530
                                202-579-5738
15                              Fax: 202-514-1793
                                Email: eduardo.palomo2@usdoj.gov
16

17                              MOLLY ANNE KELLEY - AUSA
                                U.S. Attorney's Office - Ham/IN
18                              5400 Federal Plaza, Suite 1500
                                Hammond, Indiana 46320
19                              219-937-5500
                                Fax: 219-852-2770
20                              Email: molly.kelley2@usdoj.gov

21

22   FOR THE DEFENDANT:         ADAM TAVITAS
                                Law Office of Adam Tavitas
23                              751 East Porter Avenue, Suite 3
                                Chesterton, Indiana 46304
24                              219-677-9220
                                Fax: 219-972-7110
25                              Email: Adtavitas@aol.com
```

```
 1   ALSO PRESENT:              Chad Oakes, FBI
                                Nikkole Robertson, FBI
 2
     ALSO PRESENT:              Defendant, Lorenzo Johnson
 3

 4

 5   OFFICIAL REPORTER:         Angela Phipps, RMR, CRR, CSR
                                5400 Federal Plaza
 6                              Hammond, Indiana 46320
                                (219) 852-3616
 7                              angela_phipps@innd.uscourts.gov

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings reported by stenotype.  Transcript produced by

25   computer-aided transcription.
```

1                          **Index**

2                                                    PAGE

3  **OFFICER ANTHONY STACK**

4  Direct Examination by Mr. Palomo              36

5

6       Opening Statement by the Government       21

7       Opening Statement by the Defense          31

8       Stipulation                               34

9

10 **EXHIBITS:**

11 Government's No. 18 - Uverse Customer Account Details -  48

12 Government's No. 1  - Business Records Certification  -  54

13 Government's No. 2 -  Ashley Campbell Subscriber Info -  54

14 Government's No. 2A - Facebook Machine Cookies       -  54

15 Government's No. 3 -  Facebook IP Logs               -  54

16 Government's No. 4 -  Facebook Messages A.C./N.T.     -  61

17 Government's No. 8 -  Business Records Certification  -  86

18 Government's No. 9 -  L.J. Facebook Subscriber Info   -  86

19 Government's No. 9A - Facebook Machine Cookies L.J.   -  86

20 Government's No. 10 - Facebook IT Logs L.J. Account   -  86

21 Government's No. 11 - Facebook Messages L.J./N.T.     -  92

22 Government's No. 12 - Facebook Messages L.J./J.S.     -  90

23

24

25

```
 1          (The following proceedings were had in open court,
 2          commencing at 9:00 a.m.)
 3          THE COURT:  All right.  You could be seated.  Good
 4   morning, everyone.  All right.  Let me get organized here.
 5          Again, good morning, ladies and gentlemen.  It's a
 6   pleasure to welcome you to the Hammond Division of the United
 7   States District Court for the Northern District of Indiana.  My
 8   name is Phil Simon.  I'm the Judge that's going to preside
 9   during the trial that we'll be conducting over the next
10   few days.
11          Today, we're going to be selecting a jury for a criminal
12   case, which comes to you by way of an Indictment that was
13   returned against the Defendant, which charges him with
14   violations of federal criminal law.
15          I want to give you just a brief summary of what the case
16   is about so that you have an understanding of what the
17   undertaking is.
18          But the Indictment in this case charges the Defendant,
19   Lorenzo Johnson, with conspiracy to produce child pornography,
20   distribution of child pornography, and possession of a firearm
21   by a convicted felon.
22          Now, Mr. Johnson has pleaded not guilty to those charges,
23   and the denial by the Defendant raises issues of fact to be
24   tried in this case.
25          What I want to, sort of, impress upon you at the outset
```

```
 1   here is that the Indictment that you've just heard me describe
 2   that's been brought against the Defendant is merely an
 3   accusation.  It's nothing more.  It's not evidence and affords
 4   no inference of guilt in any way, shape, or form.  It's simply
 5   the formal method by which charges are brought against a
 6   defendant.  And now that the charges have been brought against
 7   him, it's incumbent on the Government to attempt to prove those
 8   charges beyond a reasonable doubt.  And that's the undertaking
 9   that we're going to be doing over the next few days.
10        So with that, I'll give the parties an opportunity to, you
11   know, introduce themselves.
12        So, I guess, Ms. Kelley, if you want to begin and
13   introduce yourself and who's seated with you.
14             MS. KELLEY:  Good morning, everyone.  I'm AUSA,
15   Assistant United States Attorney, Molly Kelley.  And my
16   co-counsel.
17             MR. PALOMO:  Good morning.  I'm Eduardo Palomo.  I'm
18   with the Department of Justice Child Exploitation Section.
19             MS. KELLEY:  We represent the Government in this
20   case.
21             THE COURT:  Who are these folks seated with you?
22             MS. KELLEY:  We have our case agents from the FBI.
23             AGENT ROBERTSON:  Nikkole Robertson.
24             AGENT OAKES:  Chad Oakes.
25             THE COURT:  Okay.  Mr. Tavitas.
```

```
 1              MR. TAVITAS:  Thank you, Your Honor.

 2         Good morning, ladies and gentlemen.  My name is Adam

 3    Tavitas.  I'm representing Lorenzo Johnson, my client.  I have,

 4    actually, an office in Chesterton, Indiana.  Thank you.

 5         (WHEREUPON, Jury Voir Dire was had and reported, but not

 6          made a part of this record.)

 7         (The following proceedings were had in open court, before

 8          the jury, at 12:12 p.m.)

 9         (Private headset conference had as follows:)

10              THE COURT:  So does the Government accept this jury?

11              MR. PALOMO:  Yes, Your Honor.

12              THE COURT:  Does the Defense accept this jury?

13              MR. TAVITAS:  Yes, Your Honor.

14              THE COURT:  Okay.  So we'll take our lunch break at

15    this time.  I'm going to excuse everybody, give them a couple

16    instructions, and then we'll break, but we're done.  Thank you.

17         (Private conference concluded.)

18              THE COURT:  All right.  Ladies and gentlemen, both

19    parties, or sides, have now accepted this jury, and I'm going

20    to ask you all, those in the box, to please stand up and raise

21    your right hands to be sworn in.

22         (The oath was administered to the members of the jury.)

23              COURTROOM DEPUTY:  Please say, "I will."

24              JURORS:  I will.

25              THE COURT:  All right.  You may be seated, and I'll
```

```
 1   get back to you in second.

 2       I want to talk mostly now to the folks that are out in the

 3   gallery.  We selected the jury.  We never know how many people

 4   we're going to need.  Sometimes we order way too many people.

 5   Sometimes we run out.  And that's a worst-case scenario

 6   because, if we do that, then we have to adjourn and get more

 7   people here, and it's a pain.  I hope you understand.  I hope

 8   you feel like we haven't wasted your time.  I do appreciate

 9   your willingness to serve, your being punctual and listening

10   attentively, but your service is now done.  And with my

11   appreciation, you are excused.  If you need any work slips or

12   anything like that, our CSO can help you on the way out.  But

13   thank you so much.

14       (Prospective jurors excused.)

15       All right.  Ladies and gentlemen, in a couple minutes

16   here, we're going to take a recess for lunch.  We feed you

17   here.  There's a cafeteria in the building.

18       Lenny will take you down, and you'll have lunch.  I want

19   to just give you a little bit of instructions before we do

20   that.

21       As I've said earlier this morning, you are instructed not

22   to discuss this case with one another or with anybody else; and

23   if anybody attempts to discuss the case with you, I want you to

24   report it to me through our security officers here.

25       Obviously, you have only heard a tiny bit of the case.  So
```

1    you have to reserve judgment on the case until you've heard all

2    of the evidence and the law that applies to the case.

3        Also, if you see any of these folks down in the lunchroom

4    or any -- you know, on the way downstairs or maybe when you

5    come in in the morning, I'm going to instruct them to have no

6    contact with you at all.  I mean, not even a chitchat, "Hey,

7    how are you doing?  Nice day out."  So if they're just totally

8    ignoring you, they're doing it on my instruction.  Because if

9    somebody were to witness that conversation, even if it's

10   totally innocuous, if somebody were to witness it from afar,

11   they may take it the wrong way.  So we just want to avoid that.

12   So please understand that.

13       I want you also to understand that your participation as a

14   juror in this case is going to be scrutinized by one another,

15   by the Court, by the parties, and so it's really important that

16   you treat these matters as serious as you can possibly treat

17   something, because it is, and ask that you be entirely

18   circumspect and serious in the manner in which you come and go

19   from court so that no one is going to doubt that this case is

20   being fully and fairly tried so that the ends of justice can be

21   served.

22       So, with that, I'm going to excuse you.  We'll pick back

23   up at 1:20 -- Why don't we say 1:30, just to give you a little

24   extra time to get oriented here, and there's a couple matters I

25   have to take up with the lawyers anyway, and so we'll see you

1    in about an hour and 10 minutes.  Thank you.

2          (Jury out at 12:17 p.m.)

3          **THE COURT:**  Okay.  You could be seated.

4        There were a couple motions in limine that were filed that

5    I thought we would just talk about right now before I send you

6    off for lunch.  Let me just get there.

7        So the Government filed a motion in limine back on

8    July 27th, Document No. 81.

9        The first one deals with the potential penalties that the

10   Defendant is facing.  Ordinarily, of course, you know, the

11   penalties are a matter for the Court to decide.  I assume you

12   have no intention of, you know, telling the jury, "This man is

13   facing 'X' number of years in jail," or anything like that; is

14   that true?

15         **MR. TAVITAS:**  That's true, Your Honor.

16         **THE COURT:**  Okay.  So I'm going to grant the motion

17   in limine as it relates to that.

18       I'm less inclined as it relates to the cooperating

19   co-conspirators here.  So Ms. Stanley and Ms. Harper, I assume

20   they're going to testify pursuant to a plea agreement; is that

21   right?

22         **MR. PALOMO:**  No, Your Honor.  They haven't entered

23   plea agreements.

24         **THE COURT:**  Oh, they have not entered plea

25   agreements.

1    **MR. PALOMO:**  We expect that they will at some point,

2    but they have not yet.

3         **THE COURT:**  Okay.  Listen, if they testify that

4    they're expecting an agreement and expecting a benefit from

5    testifying, then I think it's fair game for counsel to explore

6    the penalties they're facing, you know, as impeachment.

7         **MR. PALOMO:**  Your Honor, to correct, Ms. Harper, I

8    believe -- Yes.  Ms. Harper actually has pleaded guilty

9    pursuant to a plea agreement to transportation of child

10   pornography.

11        **THE COURT:**  Okay.  So whatever she's facing, that's

12   fair game as far as I see.  I know in the real world there's

13   sentencing guidelines, and that's sort of, in some respects, at

14   least a starting point as to what her ultimate sentence might

15   be.  But that's stuff you'd have to inquire into on redirect.

16   But I think the penalties that she's facing are fair game.

17       So with that exception, I'll partially grant the motion in

18   limine.

19       Anybody have any question about that?

20        **MR. TAVITAS:**  No, Your Honor.

21        **MR. PALOMO:**  No, Your Honor.

22        **THE COURT:**  All right.  And I assume there's no

23   objection to the authenticity and the foundation of these

24   business records that were delineated in their motion in

25   limine.  Is that true?

```
 1          MR. TAVITAS:  I had told them previously, yes, we
 2   have no objection, Your Honor.
 3          THE COURT:  Okay.  So that's kind of a non-issue.
 4       And then there's also a motion that's sort of buried in
 5   here.  Obviously, any discussion about pleas that have been
 6   offered or plea negotiations or discussions that took place,
 7   you know, prior to trial, you know, all that is excluded from
 8   evidence.  I assume nobody disagrees with that.
 9       Is that right, Mr. Tavitas?
10          MR. TAVITAS:  That's right, Your Honor.
11          THE COURT:  Mr. Palomo?
12          MR. PALOMO:  Correct, Your Honor.
13          THE COURT:  Anything else you guys want to talk about
14   before we break for lunch?
15          MR. PALOMO:  Just briefly, Your Honor.  With respect
16   to the stipulation, the Government was going to request the
17   Court read it after the Government's opening.
18          THE COURT:  My practice is to have you guys read the
19   stipulation.  Let me know you're going to do it so it clues me
20   in here, but you can do it whenever you want to do it.
21          MR. PALOMO:  Yes, Your Honor.  We'll do that before
22   the first witness.
23          THE COURT:  Okay.  Very well.  And then you'll be
24   offering some exhibits pursuant to that, I take it?  Is that
25   what the stipulation is about?
```

1          **MR. PALOMO:**  The stipulation is about the firearm in

2     and affecting interstate commerce and with respect to the prior

3     felony conviction.

4          **THE COURT:**  Got it.  Okay.  That's right.  Okay.

5     Anything else we need to talk about?

6          **MR. PALOMO:**  Not from the Government, Your Honor.

7          **THE COURT:**  Why don't you be back here just by, say,

8     25 minutes after 1:00, you know, five minutes early, before we

9     start with the jury in case there's something else we have to

10    take up.

11         **MR. PALOMO:**  Yes, Your Honor.

12         **THE COURT:**  Thank you.

13    (Recess taken at 12:21 p.m.)

14    (Proceedings resumed in open court at 1:35 p.m.)

15         **COURTROOM DEPUTY:**  All rise.

16         **THE COURT:**  All right.  You could be seated.

17    Everybody ready to proceed?

18         **MR. PALOMO:**  Yes, Your Honor.

19         **MR. TAVITAS:**  Yes, Your Honor.

20         **THE COURT:**  Okay.  Lenny, you can call the jury.

21    I have about five to seven minutes worth of preliminary

22    instructions I'll give to them, and then we'll have opening

23    statements.

24    (Jury in at 1:36 p.m.)

25         **THE COURT:**  Okay.  You may be seated.  Welcome back,

1    ladies and gentlemen.

2         As you heard before the lunch hour, you are now the jury

3    in this case, and I'm going to take a few minutes -- Before we

4    hear from the lawyers by way of opening statement, I'm going to

5    take a few minutes to describe what your duties are as jurors

6    and to give you some instructions concerning the case.

7         Now, as the Judge in the case, one of my duties is to

8    decide all of the questions about law and procedure; and in

9    these preliminary instructions and during the trial and

10   certainly at the end of the trial, I'm going to instruct you on

11   the rules of law that you have to follow in making your

12   decision.

13        The instructions that I give you at the end of the trial

14   will be much more detailed than the instructions I'm giving

15   you now.

16        But for now, I just want to explain to you that, as

17   jurors, you have two duties:  Your first duty is to decide the

18   facts from the evidence that's presented here in court.  And

19   your second duty is to take the law as I give it to you, apply

20   it to the facts, and then decide if the Government has proved

21   the Defendant guilty beyond a reasonable doubt.

22        You have to perform these duties fairly and impartially.

23        Don't let sympathy or prejudice or fear or public opinion

24   influence you in any way.

25        Also, do not in any way let a person's race, religion,

1    color, national ancestry, or gender influence you at all in

2    your decision-making.

3        You should not take anything that I say or do during the

4    trial as indicating what I think the evidence is or what I

5    think your verdict should be.  That's your decision to make.

6    It's not mine.

7        Now, the charge against the Defendant is contained in an

8    Indictment, and you'll have a copy of the Indictment during

9    your deliberations.  And in a couple minutes you'll hear a

10   description of what the charges are in this case, but,

11   essentially, there are charges of conspiracy to distribute and

12   produce child pornography as well as being a felon in

13   possession of a firearm.

14       Now, I want to warn you, as I said, this morning.  The

15   Indictment is only a means by which to tell the Defendant what

16   he's charged with.  It's not evidence of anything.  It's just

17   an accusation, and it's not at all evidence that he's guilty.

18   It doesn't even raise a suspicion of guilt.

19       Now, each defendant is presumed innocent of the charges.

20   This presumption continues throughout the case, and it's not

21   overcome unless, from all of the evidence, you're convinced

22   beyond a reasonable doubt that the Defendant is guilty as

23   charged.

24       The Government has the burden of proving that the

25   Defendant is guilty of the charged offenses, and they have to

 1  prove it, again, beyond a reasonable doubt.  This burden stays

 2  with the Government throughout the case.  The Defendant is not

 3  required to prove anything.  He's certainly not required to

 4  prove that he's innocent.  In fact, he's not required to

 5  produce any evidence at all.

 6       Now, let's talk about the evidence.

 7       You may consider only the evidence that you see and hear

 8  here in court.  You may not consider anything that you may have

 9  seen or hear outside of court, including anything in a

10  newspaper, television, radio reports, the internet, or any

11  other source.

12       The evidence includes only what the witnesses say when

13  they are testifying in this courtroom under oath and exhibits

14  that I allow to be admitted into evidence and facts to which

15  the parties have agreed to, or stipulated to.

16       And as you might imagine, a "stipulation" is simply an

17  agreement between the parties that certain facts are true or

18  that a witness would testify in a certain way if he or she were

19  to testify.

20       Nothing else is evidence.

21       Any statements and arguments that the lawyers make is not

22  evidence.  If what a lawyer says is different from the evidence

23  as you hear it or see it, it's the evidence that matters.

24       The lawyers' questions and their objections, likewise, are

25  not evidence.  A lawyer, of course, has a duty to object if he

1    thinks that his opponent is asking questions that are improper.

2    And when an objection is made, I will be required to rule on

3    the objection.

4         Now, if I sustain the objection to a question-- I tell the

5    witness they can't answer the question --I don't want you to

6    speculate as to what the witness would have said had they been

7    given the opportunity to answer.

8         Likewise, on occasion, during the trial, you might hear me

9    say, "That testimony is stricken, and you're admonished to

10   disregard it."  If I do that, it means just what I said, that

11   you should disregard that testimony and you can't consider it,

12   and, in fact, you can't reference it back during your

13   deliberations because it's stricken from the record.

14        Pay close attention to the evidence as it is being

15   presented.  During your deliberations, you'll have the exhibits

16   that are admitted into evidence, but you'll not have a copy of

17   the transcript of these proceedings even though we have a court

18   reporter taking them down.  It's not like she could just

19   produce them.  It takes quite an undertaking to do that, so you

20   won't have access to transcripts.  And by that, I mean to tell

21   you to just listen very closely to the evidence.

22        Now, let's talk about the different types of evidence.

23        I'm sure you've heard the terms "direct evidence" and

24   "circumstantial evidence."  They're pretty straightforward, but

25   let me just take a minute to explain them.

1      Direct evidence, of course, is evidence that directly
2   proves a fact.  Circumstantial evidence is evidence that
3   indirectly proves a fact.
4      So let's take an example.  Let's say the pointing question
5   is whether it's raining outside.  Direct evidence of that fact
6   would be a witness coming in and testifying that, "I was just
7   outside, and it's raining."  That's direct evidence.
8   Circumstantial evidence of that fact might be observation of
9   somebody entering a room with a wet umbrella.  That would be
10  circumstantial evidence to suggest that, yeah, it's raining
11  outside.
12     Now, you're to consider both direct and circumstantial
13  evidence.  One is not better than the other.  It's up to you to
14  decide how much weight to give any evidence, whether it's
15  direct evidence or it's circumstantial evidence.
16     Now, give the evidence whatever weight you believe it's
17  entitled to receive.  Use your common sense in weighing the
18  evidence, and consider the evidence in the light of your
19  everyday experience.
20     People sometimes look at one fact and then conclude from
21  it that another fact exists.  This is called an "inference."
22  That's perfectly permissible for you to make inferences so long
23  as they're based on the evidence.
24     Now, let's talk a little bit about your conduct during the
25  trial and what we expect of you.

1        First, you should keep in mind during the trial-- you

2   know, I've said this, and I'm going to repeat it --that you

3   can't make up your mind on your verdict until the trial is

4   over.  You have no idea what's coming up next and until, of

5   course, you've received the final rules of law that apply to

6   the case in the jury instructions.  So you have to reserve

7   judgment.

8        Your verdict in this case must be based exclusively on the

9   law as I give it to you and the evidence that's presented

10  during the trial, and there are rules that you need to follow

11  in that regard.

12       First, do not discuss the case, including with anyone who

13  is involved in the case, among yourselves until you go to the

14  jury room to deliberate after the trial is completed.  This

15  includes posting anything to social media about the case or

16  your participation on the case.  I've had this happen, and

17  please just don't do it.

18       So don't come home tonight and get on Facebook or whatever

19  your social media of choice is and say, "Gee whiz.  I got

20  selected for jury duty in federal court today."  You know, that

21  might or likely will get a response from somebody, "Oh, that's

22  interesting.  What's the case about?"  "Oh, it's a *so and so*."

23  So just, you know, don't post to social media that you are

24  involved in this trial.  I instruct you not to do that.

25       So you must not communicate with anyone about the case,

1    including, as I said, anyone involved in the case, until after

2    you've returned a verdict.

3        When you're not in the courtroom, you must not allow

4    anyone to communicate with you about the case or give you any

5    information about it or about anyone who's involved in the

6    case.  And if somebody tries to do that, again, I want you to

7    report it to me so that I can take action promptly about that.

8        Now, of course, you can go home and tell your spouse or

9    your kid or your employer, "Ah, I got selected for jury duty.

10   I'm going to be there for four or five days," but that's it.

11   You can't tell them about the nature of the case or anything

12   else.  You can tell them about the fact of your selection, but

13   not the nature of the case.

14       Also, now, all of the information that you need to decide

15   the case will be presented here in court.  So don't seek

16   outside information about the case.  Don't go home, get on the

17   computer, start googling, you know, Ms. Kelley's name or

18   Mr. Tavitas' or the Defendants', or whatever, seeking

19   information.  You're prohibited from doing outside research.

20       The reason for that is, first, it's unfair.  It's unfair

21   because the lawyers aren't here to give you their slant on it.

22   And, more importantly, it may not be true, what you're reading

23   online.  So just, you're prohibited from doing that.  What you

24   understand about the case, you have to learn about it from this

25   courtroom.

 1        So when I say don't communicate about the case, it's
 2   through any means whatsoever; face-to-face conversations,
 3   getting on the internet, doing research, using any kind of
 4   electronic device, you know, or any social networking websites.
 5   So you're prohibited from doing all of that as it relates to
 6   seeking information about the case.
 7        Now that the trial is ready to begin, it's going to
 8   proceed in the following manner.
 9        First, as I mentioned, you'll hear opening statements from
10   the lawyers.  An opening statement is not evidence.  It's
11   simply a summary of what the lawyers expect the evidence to
12   show.
13        After the opening statements, you'll actually hear the
14   evidence.  And then after the evidence has been presented and
15   both sides have rested their cases, the lawyers will be given a
16   chance to make a closing argument, and then I will instruct you
17   on the law that applies to the case; and only then will you go
18   to the jury room to deliberate towards a verdict.
19        Now, you do have some, I believe -- notepads, do you have?
20        **JURORS:**  (Indicating.)
21        **THE COURT:**  Yeah, to take notes.  You're welcome to
22   take notes, but notes are no more important than your own
23   collective memory of the evidence, and you shouldn't be unduly
24   influenced by the notes of some other juror.
25        Sometimes people get so into note-taking, they start

OPENING STATEMENT - GOVERNMENT

1    losing track of what is going on.  And so I leave that up to

2    you.  Some people are excellent note-takers, some not so much.

3    I just ask you be cognizant that you're always in the moment

4    listening to the evidence.  If you want to jot down some notes

5    along the way, that's fine, as well.  That's up to you.

6        So, as you heard, occasionally, we'll have these sidebar

7    conferences, where we put on those headphones, turn on that

8    god-awful white noise.  We're trying in those instances to have

9    a conversation without you hearing about it.  I ask you to be

10   patient with those.  Once in a while, I might actually send you

11   outside the courtroom so you can relax in the jury room if it

12   might take a little bit longer and we can talk more freely in

13   open court.  Please be patient, because you might think that,

14   "Jeez, it's taking forever," but often, what we're doing out

15   here during those sidebars is actually shortening matters for

16   you.  So I just ask that you be patient.  I'll try to avoid the

17   interruptions as much as possible and use your time very

18   efficiently.

19       Okay.  I just want you to remember as a final thought that

20   your faithful performance as jurors is vital to the

21   administration of justice.

22       So, with that, counsel for the Government, you may proceed

23   with your opening statement.

24           **MR. PALOMO:**  Yes, Your Honor.

25                        **OPENING STATEMENT**
                          **BY MR. PALOMO:**

1

2      Good afternoon.  As I said before, my name is Eduardo

3  Palomo; and with my colleague, Molly Kelley, we represent the

4  United States.

5      Just some housekeeping matters.  Can everybody hear me

6  okay?

7      (Jurors nodded affirmatively.)

8      You should have screens in front of you.  Are all of those

9  screens working?

10      (Jurors nodded affirmatively.)

11      And we can see the screens back here.

12      So over the course of this trial, you're going to hear the

13  name "Ashley Campbell."  "Ashley Campbell" is Lorenzo Johnson.

14  Lorenzo Johnson used the Ashley Campbell Facebook account to

15  ask women to produce images of child pornography and to send

16  them to him.

17      Ashley Campbell sent messages to a woman named Kelsie

18  Gauler.  He starts by asking Kelsie Gauler, "Do you want to

19  make $2,000?"  Kelsie Gauler, needing a bit of money, says,

20  "I'm interested."

21      Lorenzo Johnson asks, "Are you freaky?  What are your

22  sexual boundaries?"

23      The next question, "Do you have access to children"?  Do

24  you have kids of your own?"  "Can you find some?"

25      Next he asks, send pictures of genitals of those children.

OPENING STATEMENT - GOVERNMENT

```
 1   What does Kelsie Gauler do?  She agrees.  She sends pictures of
 2   John Doe 1 and John Doe 2, of their penises.
 3        John Doe 1 is six years old.  John Doe 2 is four
 4   years old.
 5        Ashley Campbell sent messages to a woman named Jasmine
 6   Stanley.  How does it start?  "Do you want to make some money?"
 7   Does Jasmine Stanley need some money?  She did.
 8        What does he ask next?  "Are you freaky?"  "What are your
 9   sexual boundaries?"  "Do you have access to kids?"
10        What comes next?  "Send me pictures of their genitals."
11        Jasmine Stanley agrees and sends images of Jane Doe's
12   vagina.  Jane Doe is an infant, approximately one year old.
13        Ashley Campbell messages Dominique Harper on Facebook.
14   Starting to sound familiar?  What's next?  What's next?  Anyone
15   want to guess what the fourth one is?  Send a picture of that
16   child's genitals.  Dominique Harper responds and agrees to send
17   a picture of John Doe 3's penis.  John Doe 3 is a two-year-old
18   boy.
19        Meanwhile, Lorenzo Johnson, the Defendant, saves those
20   exact images to his personal cellphone.  He sends the same
21   images from his real Facebook account that says "Lorenzo
22   Johnson."  He takes screenshots of those messages on his
23   personal cellphone.  And he uses those messages to threaten a
24   woman named Neci Taylor on Facebook.
25        Which brings us to the Indictment, the reason why we're
```

1    here, these charges.

2    The Defendant is charged with one count of conspiracy to

3    produce child pornography with Kelsie Gauler on October 19th,

4    2019.

5    He's charged with a second count of conspiracy to produce

6    child pornography with Jasmine Stanley on October 20th, 2019.

7    He's charged with a third count of conspiracy to produce

8    child pornography with Dominique Harper on September 3rd,

9    2019.

10   He's charged with a fourth count of distribution of child

11   pornography for sending those images to other people on

12   Facebook.

13   And, finally, he's charged with one count of being a felon

14   in possession of a firearm.

15   When FBI agents searched his residence after getting a

16   search warrant, they found a firearm in his residence.  He said

17   that this firearm belonged to him, and he's a felon.

18   So over the course of this trial, we're going to present

19   witnesses.  We're going to present investigators, and you'll

20   hear from two of the Defendants' co-conspirators.

21   Starting with the investigators, shortly, you'll hear from

22   Officer Anthony Stack.  He's the one that first received a

23   report from a concerned citizen.  Later on, we learned that

24   this person is Neci Taylor.  This is the person that the Ashley

25   Campbell account was communicating with and asked, "Send me

1    child pornography."

2        You'll see Facebook messages that are a little disturbing

3    in content about the sexual abuse of children, but Neci Taylor

4    ultimately goes to the police and says, "This is unacceptable,

5    and you need to investigate."

6        So the police start doing some investigation.  Anthony

7    Stack ends up using Neci Taylor's Facebook account to

8    communicate with Ashley Campbell to find out who Ashley

9    Campbell was.

10        When Officer Stack received this report, he didn't know

11    anything about Ashley Campbell; and it's through his efforts

12    and the efforts of other investigators that we know that

13    Ashley Campbell is the Defendant.

14        You'll hear from Sergeant Michael Paoletti.  He did a

15    forensic analysis of the Defendant's cellphone, the cellphone

16    seized from his residence that the Defendant admits is his.

17    He'll talk about images of child pornography that he extracted

18    from the Defendant's cellphone; images of John Doe 1 and 2, six

19    and four years old; images of Jane Doe, an infant; and,

20    finally, images of John Doe 3, a two-year-old.  These are

21    images on his cellphone that Sergeant Paoletti will testify

22    about extracting from that cellphone.

23        You'll hear from Officer Matthew Barr.  Officer Matthew

24    Barr, we're going to offer him as an expert in digital forensic

25    analysis.  So for those of you who may not know so much about

OPENING STATEMENT - GOVERNMENT

1    IP addresses and how the internet works, we'll have him educate

2    you about that so we're all on the same page when we're talking

3    about IP addresses and sort of how Facebook operates.

4        You'll hear from Special Agent Chad Oakes.  He's going to

5    read off some of these communications between Ashley Campbell

6    and Jasmine Stanley, between Ashley Campbell and Dominique

7    Harper, between Ashley Campbell and Kelsie Gauler.  You'll get

8    to see and read those messages, and you'll get to hear them

9    read out loud.

10       I'll caution you that in some of these communications

11   you're going to hear words describing the sexual abuse of

12   children.  These are the words of "Ashley Campbell," of the

13   Defendant.

14       You'll hear from Special Agent Nikkole Robertson.  She

15   interviewed the Defendant.  She searched his home.  She found a

16   firearm in his home.  She found a cellphone in his home, and

17   she heard him essentially admit to distributing child

18   pornography and to operating the Ashley Campbell account.

19       You're also going to hear from the co-conspirators.

20   Ms. Jasmine Stanley, the woman who took pictures of Jane Doe.

21   You'll hear from Dominique Harper, the woman who took pictures

22   of John Doe 3.

23       You'll learn they are both indicted in the Northern

24   District of Illinois for conspiracy to produce child

25   pornography.

```
 1        So what to expect.

 2        You should expect to see these communications here between

 3   Ashley Campbell and these accounts.  You'll also see Facebook

 4   messages sent from Lorenzo Johnson's personal account to Neci

 5   Taylor and to Jasmine Stanley.  You'll expect to see images of

 6   child pornography extracted from the Defendant's phone.  You

 7   should expect to see the firearm found at his residence.  And

 8   you'll expect to see a videotaped interview of the Defendant.

 9        What else to expect, what are the similarities that we're

10   going to see between Lorenzo Johnson and Ashley Campbell.

11        You'll see that Lorenzo Johnson accesses the internet from

12   this IP address, 99.90.12.39.  Can you guess which IP address

13   Ashley Campbell used to access Facebook?

14        Lorenzo Johnson says that he creates screenshots of fake

15   bank accounts.  What does Ashley Campbell send?  Screenshots of

16   fake bank accounts.

17        You'll see that Lorenzo Johnson sent a penis picture to

18   Jasmine Stanley from his personal account.  You'll see three

19   days later the Ashley Campbell account sending that same penis

20   picture, the exact same one, to Neci Taylor.

21        You'll see that Lorenzo Johnson uses the word "freaky" in

22   reference to sexual topics.  What does Ashley Campbell do?

23   Same thing.

24        You'll see that Lorenzo Johnson set up the

25   "219dingding219" email account.  Which one is the registration
```

1  account for the Ashley Campbell Facebook account?

2  "219dingding219."

3       So briefly on IP addresses.

4       You're going to hear from Officer Matt Barr.  But just so

5  you know what to expect during his testimony, you'll hear an IP

6  address is like a home address.  You can't get to my house

7  without putting in my address.  So that's how you know how to

8  get there.  Same with IP addresses and internet traffic.  Make

9  sense?

10      So an internet provider like AT&T is going to assign you

11 an IP address.  Every IP address is unique to that service

12 address.  So my house, the IP address at my house is going to

13 be unique.  There's no other IP in the world like it because,

14 otherwise, internet traffic wouldn't know where to go.

15      You'll see the physical address, 6831 Jackson Avenue in

16 Hammond.  That's where the Defendant lived.  This is his IP

17 address from AT&T.

18      That IP address is directly linked to Facebook activity on

19 these three dates.

20      You'll see these dates correspond to the dates in the

21 Indictment that we've charged him with conspiring to produce

22 child pornography.

23      Let's start with the first date.

24      Now, as a brief, kind of, warning for dates.  Facebook

25 records dates in what's called "universal coordinated time" or

 1   something like that.  UTC, okay?  UTC is approximately

 2   five hours ahead of Central Standard time.

 3        So we'll explain this throughout the trial, but here we're

 4   using UTC times, okay?

 5        So at 2300 hours, 23:19:28, you see Ashley Campbell

 6   sending to Jasmine Stanley an image of an infant's penis from

 7   the Defendant's IP address.  Less than one minute later, the

 8   Ashley Campbell account says to Jasmine Stanley (indicating

 9   with slide).  That's what the Ashley Campbell account says.

10        On October 20th, Ashley Campbell sends an attachment

11   from the Defendant's IP address of an infant's penis.  This was

12   an image of John Doe 3's penis sent from the Defendant's IP

13   address.

14        On September 3rd -- sorry -- On September 3rd, you

15   have Ashley Campbell sending an attachment, and then

16   nine minutes before the Ashley Campbell account sent that

17   attachment, you have this message to Dominique Harper

18   (indicating with slide).

19        "Ashley Campbell," the user of Ashley Campbell, accessed

20   Facebook from the Defendant's IP address hundreds of times over

21   the course of July to December of 2019.

22        In the Defendant's interview, Agent Oakes asks him, "Did

23   you ask her to send nude pictures of the kid?"  What did the

24   Defendant say?  Yes.

25        He elaborates.  "It was like, 'What's something you

OPENING STATEMENT - GOVERNMENT

1    wouldn't show nobody?'  And it was like, 'You got a kid?'  And

2    I was like, 'Yeah.'  So then I was like, 'Send me a picture.'"

3        Now, through the rest of his interview, he offers

4    improbable explanations; but ultimately, when you're watching

5    this interview, pay attention.  He admits to using the Ashley

6    Campbell account.

7        And what's most important, on the dates alleged in the

8    Indictment, there are links to Lorenzo Johnson.

9        He also admits to distributing child pornography.  He

10   admits to having a firearm.

11       Why all of this?  Because Ashley Campbell is Lorenzo

12   Johnson, the Defendant.

13       So at the close of evidence, we're going to ask that, for

14   Count One, conspiracy to produce child pornography with Kelsie

15   Gauler, that you find the Defendant guilty.

16       We're going to ask that, for Count Two, conspiracy to

17   produce child pornography with Jasmine Stanley, that you find

18   the Defendant guilty.

19       For Count Three, conspiracy to produce child pornography

20   with Dominique Harper, that you find him guilty.

21       We'll ask that, for Count Four, distribution of child

22   pornography, that you find the Defendant guilty.

23       We'll ask that, for Count Five, felon in possession of a

24   firearm, that you find the Defendant guilty.

25           **THE COURT:**  Okay.  Thank you, Mr. Palomo.

OPENING STATEMENT - DEFENSE

```
 1        Mr. Tavitas, you may proceed with your opening statement.
 2            MR. TAVITAS:  Thank you, Your Honor.
 3                        OPENING STATEMENT
                        BY MR. TAVITAS:
 4
 5        Good afternoon, ladies and gentlemen.
 6        For many of you, this is the very first time as jurors,
 7   and we're thankful --
 8            THE COURT:  Mr. Tavitas, if you're comfortable, would
 9   you mind lowering your mask just so they can kind of get a
10   sense for who you are.
11            MR. TAVITAS:  So used to wearing it.
12        Ladies and gentlemen, I appreciate your service here this
13   afternoon and for the next week or so.
14        As indicated, I believe some of you had prior jury
15   experience, some civil, some criminal, maybe -- There's a big
16   difference.
17        Civil, it's what's called a preponderance of the evidence.
18   So it's 51 percent that the person did it, then you find the
19   defendant liable.  Criminal, completely different.  It's beyond
20   a reasonable doubt.
21        You can't think, "Well, maybe he did it," or, "You know
22   what, there's a probability, there's a good chance he might
23   have done it."  You must find beyond a reasonable doubt that
24   the government has proven its case in order to get a verdict of
25   guilty.
```

OPENING STATEMENT - DEFENSE

1       Ladies and gentlemen, I, oftentimes, when I -- in jury

2   selection, it's kind of hard to see when people have masks.  I

3   always kind of like to look at the jurors' reaction when the

4   judge announces what type of case it is, whether it be a murder

5   case or maybe a drug case.

6       I'm certain you've heard what this Indictment was, you're

7   thinking, "Oh, my," you know, and there is no doubt these are

8   very serious allegations.  There is no doubt -- unfortunately,

9   there are going to be -- probably going to see some graphic

10  images that no one wants to see.  But, again, don't cloud --

11  don't make that, kind of, cloud like, "Oh, my God, I've seen

12  these images," and automatically assume my client is guilty.

13      Again, as Judge Simon said over and over this morning to

14  maybe the individual jurors or the entire jury pool, we have

15  what's called -- Mr. Johnson deserves what's called a

16  presumption of innocence, and also that, in order to find him

17  guilty, again, the Government would have to prove its case

18  beyond a reasonable doubt.

19      I think I've heard Judge Simon say many times keep an open

20  mind.  That's what I'm asking.  Even though you might see a

21  graphic image or you might hear something inappropriate, again,

22  don't let that cloud the whole big picture, the whole big

23  picture of what the Government's proof that they have to do in

24  order to convince each and every juror of these charges.

25      I believe there's going to be testimony of Mr. Jackson

1   (sic) residing at 6831 Jackson Avenue in Hammond, Indiana.  One

2   thing I don't think the Government indicated in its opening

3   argument was that it's just, like, a one-person residency.

4   It's my understanding there are, like, four other units, and

5   four other units all sharing the internet.

6        You'll also hear -- the Government indicated, okay,

7   there's some investigators, and there's cooperating witnesses.

8   I ask that you actually listen very, very carefully, were they

9   willing, did they come in out of the graciousness of their

10  heart in order to, you know, tell the authorities what they may

11  have saw, what they may have observed.  Did they get in

12  trouble, or maybe, like Mr. Johnson being charged, maybe

13  they've been charged with a crime, and maybe they're looking --

14  said, "Oh, no, I'm in deep trouble.  I need to help myself."

15  That's the reason why they may testify.

16       So I ask you to take their testimony very closely and to

17  think about and just kind of listen to what benefits they may

18  be getting from testifying.

19       Ladies and gentlemen, you're going to have -- the

20  Government is going to have to prove that, with these -- with

21  these images, that Mr. Johnson was supposedly this "Ashley

22  Campbell."  You're going to have to ask yourself did someone

23  else send any of those images or any of those pictures.

24       Again, you have the presumption of innocence.  The

25  Government must prove its case beyond a reasonable doubt.  I

```
 1    don't believe they're going to be able to do that to you in the
 2    next week or so.  And at the end of this trial, I'm going to
 3    ask that you find my client not guilty.
 4         Thank you.
 5              THE COURT:  Thank you, Mr. Tavitas.
 6         All right.  The Government may call its first witness.
 7              MR. PALOMO:  Your Honor, before we call the first
 8    witness, may the Court read the stipulation to the jurors?
 9              THE COURT:  Sure.  I just have you guys read the
10    stipulation, so you may proceed.
11              MR. PALOMO:  Yes, Your Honor.
12         I'm just going to read starting with the caption.  As the
13    Judge instructed before, this is a stipulation, and this is
14    captioned "Notice of Stipulations Between the Parties."
15         "Comes now the United States of America, by Tina L.
16    Nommay, Acting United States Attorney for the Northern District
17    of Indiana, through Abizer Zanzi and Molly Kelley, Assistant
18    United States Attorneys, to provide notice to the Court that
19    the parties have reached the following evidentiary
20    stipulations:"
21         "Stipulation #1.  The United States and Defendant Lorenzo
22    Johnson agree and stipulate that the defendant was convicted of
23    Section 12-16F of the Illinois Criminal Code (720 ILCS 5/12-16F
24    (West 1998)), a crime punishable by more than one year of
25    imprisonment (commonly known as a felony) prior to
```

1    December 17, 2019 and that Defendant Lorenzo Johnson knew that

2    he had so been convicted."

3        "Stipulation #2.  The United States and Defendant Lorenzo

4    Johnson agree and stipulate that the Taurus model PT 140 .40

5    caliber handgun identified in," what is now Count Five of the

6    Indictment.  The stipulation reads "Count Seven," but it is now

7    Count Five of the Indictment, "was manufactured outside of the

8    state of Indiana and therefore traveled in interstate

9    commerce."

10       And with that, the Government calls Officer Tony Stack.

11           **THE COURT:**  Is that so stipulated, Mr. Tavitas?

12           **MR. TAVITAS:**  It is, Your Honor.

13           **THE COURT:**  Ladies and gentlemen, as I explained

14   earlier, stipulations are a way of essentially streamlining the

15   trial.  If there are facts that are not in dispute, there's no

16   purpose to bringing people in to prove something up that nobody

17   is disputing, so the parties stipulate, or agree, to those

18   facts.

19       And the ones that counsel just read to you, those facts;

20   that the Defendant was previously convicted of a felony

21   offense, and he knew that, and that the gun, this Taurus,

22   traveled in interstate commerce, those facts are not in

23   dispute; they've been stipulated to; and you should accept them

24   as having been proven.

25       Okay.  You may proceed.

 1          Raise your right hand, sir, to be sworn in.

 2          (The oath was duly administered.)

 3              **THE WITNESS:**  I do.

 4              **THE COURT:**  You may be seated.

 5      Sir, if you wouldn't mind taking your mask off during your

 6  testimony, and you can put it back on when you're done, okay?

 7              **THE WITNESS:**  Yes, Your Honor.

 8              **THE COURT:**  All right.  Mr. Palomo, you may proceed.

 9              **MR. PALOMO:**  Can you hear me okay here?

10              **THE WITNESS:**  I can.

11              **MR. PALOMO:**  And, Your Honor, does the Court prefer

12  that I keep the mask on during --

13              **THE COURT:**  It's up to you.  If you're comfortable

14  taking it off, that's fine.  If you prefer to keep it on,

15  that's good.  But I want them to see the witness.

16              **MR. PALOMO:**  Okay.  Yes, Your Honor.

17              **ANTHONY STACK, GOVERNMENT'S WITNESS, SWORN**

18                      <u>**DIRECT EXAMINATION**</u>

19  **BY MR. PALOMO:**

20  Q.   Good afternoon, Officer Stack.  How are you today?

21  A.   **I'm good.  Thank you.**

22  Q.   Sir, can you introduce yourself to the jury beginning with

23  your job title.

24  A.   **Sure.  My name is Anthony Stack.  I'm a Cook County**

25  **Sheriffs police officer.  I've been with Cook County Sheriffs**

 1  police department for approximately 28 years.

 2      I'm assigned to our Special Victims Unit with the Cook

 3  County Sheriffs police department, which I've been assigned

 4  since 2008.

 5      I'm also currently on the FBI's Child Exploitation and

 6  Human Trafficking Task Force, which I've been since --

 7          THE COURT:  Sir, can you get you to move off the

 8  microphone.  It's popping a lot.  I think you're going to make

 9  Angie's ears --

10          THE WITNESS:  I apologize.  Is this better?

11          THE COURT:  Just as long as you get off the mic

12  there.  All right.

13  BY MR. PALOMO:

14  Q.   I think you left off where you were saying the types of

15  crimes that you investigate or the squads you've been

16  assigned to.

17  A.   Sure.  So my primary squad now is the Child Exploitation

18  Unit.  The primary cases we investigate are child exploitation

19  cases or child pornography cases, distribution, possession,

20  production of child pornography, which includes the sexual

21  assault of children as well, and also cases involving indecent

22  solicitation of children, where adults are online, where

23  they're trying to communicate with children to meet up for a

24  sexual purpose or to have them produce images of child

25  pornography.

1   Q.   What kind of training have you received in this kind of

2   child exploitation related job duties that you have?

3   A.   **Sure.  Well, starting back when I started, I went through**

4   **the Cook County Sheriffs police academy.  Since then, I've gone**

5   **through the Chicago Police Department's detective academy, and**

6   **I've also attended the FBI's 40-hour online undercover**

7   **certification course.**

8   Q.   Now, pivoting to how you became involved in the

9   investigation into Lorenzo Johnson.  How did you first learn

10  about this investigation?

11  A.   **I was first contacted by a detective with the Broadview**

12  **Police Department.  She had made contact with a person by the**

13  **name of Shanese Taylor, who worked in the town of Broadview.**

14  **Shanese Taylor went to Broadview Police Department to report**

15  **that she had been communicating with an individual --**

16          **MR. TAVITAS:**  Objection, Your Honor.

17          **THE COURT:**  What's the grounds?

18          **MR. TAVITAS:**  Hearsay.

19          **THE COURT:**  All right.  Sustained.

20      Ask another question.

21  **BY MR. PALOMO:**

22  Q.   So what did you learn about the report, and what did that

23  cause you to do to investigate next?

24  A.   **Sure.  I learned from the report that Shanese Taylor had**

25  **communicated with an individual via Facebook who had sent her**

ANTHONY STACK - DIRECT

```
 1    images of child pornography.
 2        The detective in Broadview asked for us to take over the
 3    investigation.  So at that point, I went over and contacted
 4    Mrs. Taylor and interviewed her in person.
 5    Q.  So let's kind of break this down quickly.
 6        You said Facebook?
 7    A.  That's correct.
 8    Q.  Can you explain to the jury what Facebook is.
 9    A.  Sure.  Facebook is a social media application, where
10    people are allowed to create accounts.  They can communicate
11    with each other.  They can create Facebook pages and status
12    updates.  There's also a messaging function in there, where
13    they can message with each other and send photographs and
14    videos back and forth.
15    Q.  Does a Facebook user have to use the internet to access
16    Facebook?
17    A.  Yes.  The internet is required.
18    Q.  So after you heard from Neci Taylor, did you review
19    Facebook messages between Neci and Ashley Campbell?
20    A.  Yes, I did.
21    Q.  Generally speaking, what were those communications about?
22    A.  The communications between Neci Taylor and the user of the
23    Ashley Campbell Facebook account were sexual in nature,
24    primarily sexually abusing children and talks of producing
25    images and videos of the sexual assault of children in order to
```

1    gain money for those pictures and videos.

2    Q.    Who initiated that conversation?

3    A.    That would be the user of the Ashley Campbell account.

4    Q.    What kind of images did the Ashley Campbell account send?

5    A.    I had viewed at that point two images of two minor

6    children, two boys, approximately one and two years old, a

7    close-up of their genitals that she had sent -- the user of the

8    Ashley Campbell account sent to Neci Taylor's Facebook account.

9    Q.    After you reviewed these images sent from the Ashley

10   Campbell account to the Neci Taylor account, what did you do

11   next to investigate this?

12   A.    At this point, I asked Shanese Taylor -- she goes by

13   "Neci" -- I asked Ms. Taylor for her consent to take over her

14   Facebook account so we could take it over in an undercover

15   capacity, which she agreed to.

16   Q.    Is that something that Neci did voluntarily?

17   A.    Yes.  You have to do that with consent, and she actually

18   filled out a consent form allowing us to take over her account.

19   Q.    Can you describe how that works.

20   A.    Sure.  She provides us with her email address and password

21   that she would normally use to log in to her Facebook account.

22   We put that on the consent form.  She signs it, allowing us

23   consent to take over her account.

24        We would then use that information to log in to her

25   account in an undercover capacity using an undercover laptop.

1   Q.   Is that a common technique?

2   A.   **Yes, it is.**

3   Q.   Why do you do that in investigations?  What's the purpose

4   of it?

5   A.   **It's multifaceted.  One is to find out -- to help identify**

6   **the user behind the Ashley Campbell account.  And the other one**

7   **in this instance was to try and validate whether or not what**

8   **the user of the Ashley Campbell account was communicating was,**

9   **in fact, true.**

10      **The user of the Ashley Campbell account had stated she had**

11  **access to children that she was sexually abusing, and we wanted**

12  **to make sure if that was, in fact, true or not.  Sometimes**

13  **people make stuff up.  We wanted to make sure that was true.**

14  Q.   At that point in the investigation, did you know who was

15  using the Ashley Campbell account?

16  A.   **I did not.  Not at that point in the investigation.**

17  Q.   Okay.  So after you assumed this online identity, can you

18  describe the nature of your messages with the Ashley Campbell

19  account.

20  A.   **The types of messages that I -- took place when**

21  **communicated with the user of the Ashley Campbell account were**

22  **similar in nature to what happened before.**

23      **We were talking --**

24          **THE COURT:**  Sir, you've got to slow down.

25          **THE WITNESS:**  I apologize.

 1          **THE COURT:**  Honestly, you're speaking so quickly,

 2   it's very difficult.  Just slow down.

 3          **THE WITNESS:**  I'll slow down.  Yes, Your Honor.

 4   A.   **The communications that I had with the user of the Ashley**

 5   **Campbell account were similar in nature to what the user of the**

 6   **Ashley Campbell account had been speaking with -- originally**

 7   **with Neci Taylor.  That would be the sexual abuse of children**

 8   **and also producing images and/or videos of that sexual abuse**

 9   **with children for money.**

10   BY MR. PALOMO:

11   Q.   Did the Ashley Campbell account send you any images?

12   A.   **Yes.**

13   Q.   What were those?

14   A.   **They were images of child pornography, images of children,**

15   **a male and a female, approximately one to two years old, of**

16   **their genitals.**

17   Q.   When you were using the Neci Taylor account, which other

18   Facebook users did you communicate with?

19   A.   **I also communicated as Neci Taylor with a Facebook account**

20   **under the name of Lorenzo Johnson and a Facebook account under**

21   **the name of Ashley Gauler.**

22   Q.   So for the Lorenzo Johnson account, when you're looking at

23   the screen, what name shows up there?

24   A.   **The display name for that account was "Lorenzo Johnson."**

25   Q.   Were there any images on that account identifying who

ANTHONY STACK - DIRECT

1    used it?

2    A.   **Yes, there was.**

3    Q.   And what were the messages between Lorenzo Johnson, that

4    account, and Neci Taylor about?

5    A.   **Initially, prior to me taking over the account, there were**

6    **just some chitchat back and forth between the two of them.**

7        **Then at one point, the Lorenzo Johnson account had told**

8    **Neci Taylor that he had found a post on Facebook where**

9    **Neci Taylor was communicating with an unknown white lady about**

10   **sexually abusing children.**

11   Q.   And what were the messages between the Ashley Gauler

12   account and Neci Taylor about?

13   A.   **Those communications were specifically regarding the**

14   **sexual abuse of children.  Ashley Gauler had asked Neci Taylor**

15   **if she would babysit her children so she could take videos and**

16   **images of Neci Taylor sexually abusing Gauler's children.  They**

17   **would then split the money off of those videos and those**

18   **pictures that were sold.**

19   Q.   So these were multiple accounts talking to Neci Taylor

20   about essentially the same thing?

21   A.   **That's correct.**

22   Q.   At this stage in the investigation, which Facebook

23   accounts were you interested in investigating further?

24   A.   **The Ashley Campbell Facebook account, the Lorenzo Johnson**

25   **Facebook account, and the Ashley Gauler Facebook account.**

1   Q.   And during your investigation, what other Facebook

2   accounts did Ashley Campbell communicate with about similar

3   topics?

4   A.   **We had learned that the Ashley Campbell account was**

5   **communicating with a Jasmine Stanley Facebook account, a**

6   **Dominique Harper Facebook account, a Kelsie Gauler Facebook**

7   **account, and also a Brenda Banks Facebook account.**

8   Q.   So let's talk about what you do when you identify an

9   account that you're interested in investigating further.

10       Once you identify one of these accounts, what do you do

11   next to investigate it?

12   A.   **The first thing we do is issue a preservation letter for**

13   **the accounts.  So we would send a preservation letter to**

14   **Facebook for each account so they would preserve the data for**

15   **that account.**

16       **The next thing we would do is issue a subpoena for**

17   **subscriber information for each of those accounts.**

18   Q.   What's a subpoena?

19   A.   **A subpoena is a legal document that we then issue off to**

20   **Facebook in order to obtain subscriber information.  The kinds**

21   **of information we're looking for is -- Well, with subscriber**

22   **information, what they're going to provide is any information**

23   **they use to sign up for the account, to include a name, email**

24   **address, phone number, an associated email address, and also**

25   **IP logins, the IP address that they were using to log in or log**

1    out from the account itself.

2    Q.   Is that information that you can get generally without a

3    subpoena?

4    A.   **No.  You need a subpoena to get that information.**

5    Q.   That's the only way Facebook is going to give that

6    information up?

7    A.   **That's correct.**

8    Q.   Can you tell the jury why you want to obtain subscriber

9    information about a Facebook page.

10   A.   **We obtain subscriber information to identify the user**

11   **behind that Facebook account.**

12   Q.   Did you request subscriber information for the Ashley

13   Campbell account?

14   A.   **I did.**

15   Q.   Did you request the same information for the Lorenzo

16   Johnson account?

17   A.   **I did.**

18   Q.   And did you request information about the IP addresses

19   associated with those accounts?

20   A.   **Yes, I did.**

21   Q.   Let's pause briefly here, and I'll have you describe to

22   the jury in laymen's terms what an IP address is.

23   A.   **Sure.  An IP address is a unique set of numbers that an**

24   **internet service provider such as Comcast would assign to a**

25   **house or a business.  When someone in that house is going to**

1    connect to the internet, they would connect to a device that

2    has that IP address associated with it.  That's what they would

3    use to connect to the internet.

4    Q.   Why do you request information about IP addresses in these

5    investigations?

6    A.   **That's also to help further identify the user behind the**

7    **account in question.**

8         **MR. PALOMO:**  And, Your Honor, I'm going to show the

9    witness Government's Exhibit 18.  If we can just have the mains

10   turned off here and confirm that that's not present for any of

11   the jurors right now.

12        **THE COURT:**  Yeah.  Let me just explain to you, ladies

13   and gentlemen.  I have a toggle switch here that allows the

14   witness, me, and the other folks to see it on our screens but

15   prohibits you from seeing it.  Once it's admitted into

16   evidence, then I hit the button, and then you'll be able to see

17   it, as well.  Okay?

18        So you may proceed.

19        **MR. PALOMO:**  Just trying to make a little bit of room

20   here.

21   Q.   Officer Stack, can you see this?

22   A.   **Yes, I can.**

23   Q.   What is this document?

24   A.   **These are subpoena results from AT&T.**

25   Q.   And just for the record, I don't think we can see it here

ANTHONY STACK - DIRECT

1    on the ELMO, but this is Government's Exhibit 18, so I might

2    have to move it a little bit.  But can you see that that's

3    Government's Exhibit 18?

4    A.   **Yes.**

5    Q.   So for this document here, did you request this?

6    A.   **Yes, I did.**

7    Q.   And why did you ask for information about these

8    IP addresses listed here?

9    A.   **Those IP addresses were associated or found on the**

10   **subpoena returns from the Facebook account associated with**

11   **Ashley -- the user of the Ashley Campbell account and also the**

12   **user of the Lorenzo Johnson Facebook account.**

13   Q.   Turning to page 4, can you see that?

14   A.   **Yes, I can.**

15   Q.   What is that document?

16   A.   **It's a Certificate of Authenticity from AT&T.**

17   Q.   Have you reviewed all of Government Exhibit 18?

18   A.   **I have.**

19   Q.   Is that a fair and accurate representation of the

20   information you received from AT&T?

21   A.   **Yes, it is.**

22        **MR. PALOMO:**  Your Honor, the Government moves to

23   admit Exhibit 18 in evidence.

24        **THE COURT:**  Any objection?

25        (Counsel conferring inaudibly off the record.)

```
 1              MR. TAVITAS:  Your Honor, I don't have an objection.
 2        I was trying to get the exhibit to follow along with the
 3   Government.
 4              THE COURT:  That's okay.  Take your time.
 5              MR. TAVITAS:  (Pause.)  Thanks.
 6              THE COURT:  Exhibit 18 is admitted.  I'll display it.
 7   BY MR. PALOMO:
 8   Q.   I'm zooming in here.  Can you explain the information
 9   that's on this page.
10   A.   This front page contains a lot of technical information
11   that is provided by AT&T; but, primarily, there's IP addresses
12   that are displayed on this page that are associated with the
13   account.
14              MR. PALOMO:  I'm going to highlight something on the
15   screen right here.  Can everybody see that okay?
16        (Jurors nodded affirmatively.)
17   BY MR. PALOMO:
18   Q.   Officer Stack, what did I just highlight right there?
19   A.   An IP address.
20   Q.   And right here, I'm highlighting something else.  What's
21   that?
22   A.   That is an email address that is associated with the AT&T
23   account.
24   Q.   Going down to historical IP provisioning, and I'm going to
25   highlight another series of numbers.  What are those numbers
```

 1    there?

 2    A.    **That is also an IP address.  It's an IPv6 address.  It's**

 3    **in a different format than the first one, but it's another**

 4    **IP address that is associated with the AT&T account.**

 5    Q.    Now I'm going to turn to page 2 of this exhibit.  Let me

 6    make sure we can get this in a way that's easier to see.

 7          What information do you see on "primary contact

 8    information"?

 9    A.    **That is the name "Jordan Johnson."**

10    Q.    Who is Jordan Johnson?

11    A.    **Jordan Johnson is the son of Lorenzo Johnson.**

12    Q.    How old is Jordan Johnson?

13    A.    **Jordan is approximately 12 years old.**

14    Q.    Now, I'll zoom in a little bit more.  What are those

15    addresses listed there?

16    A.    **6831 Jackson Avenue, Hammond, Indiana.**

17    Q.    Can you just highlight that for the jury so that we're all

18    looking at the same items.

19    A.    **(Witness complied.)**

20    Q.    Now, who actually lives at that address?

21    A.    **Lorenzo Johnson lives at that address.**

22    Q.    Does Jordan Johnson live at that address?

23    A.    **We found no indication that Jordan resided at that**

24    **address.**

25    Q.    Now, is that internet service actually set up and used by

ANTHONY STACK - DIRECT

1    the Defendant?

2    A.   **Yes.**

3    Q.   Going back to the first page.  I'm going to clear out that

4    red circle.

5         Was this the IP address associated with the Ashley

6    Campbell account?

7    A.   **Yes, it was.**

8    Q.   Can you read that out.

9    A.   **99.90.12.39.**

10   Q.   Where else have you seen that IP address?

11   A.   **I've also seen that IP address associated with the Lorenzo**

12   **Johnson Facebook account.**

13   Q.   Now, next, I'd like to talk to you about how you request

14   information from a Facebook account.

15        So can you generally describe what that process is for you

16   when you want to get more than just subscriber information from

17   Facebook.

18   A.   **If we want anything further than subscriber information,**

19   **we would need to issue a search warrant to Facebook.  That**

20   **would be specifically if we wanted pictures or messages that**

21   **were sent back and forth via Facebook.  That's called content,**

22   **and we need a search warrant for that.**

23   Q.   Can you briefly explain the search warrant process.

24   A.   **Sure.  We'd have to write up an affidavit.  I would write**

25   **up an affidavit stating the reasons why I am requesting a**

1    search warrant for content for that account.

2        We then have to present that to a judge, who would have to

3    say whether or not we have probable cause to then get that

4    search warrant.

5    Q.   And would Facebook give you the content of an account, so

6    the messages and the images that a user sends, without a search

7    warrant?

8    A.   **No, they would not.**

9    Q.   Now, can you explain what type of data Facebook maintains

10   as part of a Facebook account.

11   A.   **Facebook will retain the subscriber information,**

12   **IP addresses associated with the account, pictures associated**

13   **with the account, messages sent back and forth within the**

14   **account, groups that they may belong to, friends lists that**

15   **they belong to, email addresses associated with when those**

16   **images were sent back and forth between the accounts.  Things**

17   **of that nature.**

18   Q.   Would it also record the type of device that you use to

19   access Facebook?

20   A.   **Yes, it will.**

21   Q.   So if you use a cellphone, would it record the model of

22   the cellphone?

23   A.   **Yes, it would.**

24   Q.   Now, I'm going to talk with you next about Government

25   Exhibits 1 through 4.  Have you reviewed those?

ANTHONY STACK - DIRECT

1   A.   **I have.**

2   Q.   So I'm going to start by showing you Government Exhibit 1.

3        **THE COURT:**  Do you want the screen off?

4        **MR. PALOMO:**  Yes, Your Honor.

5        **THE COURT:**  Let me just ask, are you going to object

6   to any of these?  Just so we can short-circuit.  Or is there a

7   possibility you might?

8        **MR. TAVITAS:**  I guess there's always a possibility,

9   but more likely than not --

10       **THE COURT:**  No, that's fine.

11       **MR. PALOMO:**  Is there a particular shorthand the

12  Court would prefer to use to turn it on and off, Your Honor?

13       **THE COURT:**  No, no.  I'll take care of it.  Once you

14  admit it in evidence, I'll make sure I display it.

15       **MR. PALOMO:**  Yes, Your Honor.

16  BY MR. PALOMO:

17  Q.   Officer Stack, I'm showing you Government's Exhibit 1.

18  What is this?

19  A.   **This is a Certificate of Authenticity provided by**

20  **Facebook.**

21  Q.   And what user is that Certificate of Authenticity

22  associated with?

23  A.   **That would be for the Ashley Campbell Facebook account.**

24  Q.   Have you reviewed Exhibits 2, 2A, and 3?

25  A.   **I have.**

ANTHONY STACK - DIRECT

```
1   Q.   What are those exhibits?
2   A.   Those are excerpts, or portions, from the search warrant
3   that was performed on the Ashley Campbell Facebook account.
4   Q.   So is that material you received from Facebook about the
5   Ashley Campbell account?
6   A.   Yes, it is.
7   Q.   So let's kind of break it down with Exhibit 2.  What is
8   this?
9   A.   That is the subscriber information for the Ashley Campbell
10  Facebook account.
11  Q.   I'm going to Exhibit 2A now.  What is this?
12  A.   Those are cookies that are associated with the Ashley
13  Campbell Facebook account.
14  Q.   And, finally, Exhibit 3, what is this?
15  A.   Those are IP addresses that are associated with images
16  sent from the Ashley Campbell Facebook account.
17  Q.   Is that information normally retained by Facebook?
18  A.   Yes, it is.
19  Q.   And are these materials that you normally receive when
20  Facebook responds to a search warrant?
21  A.   Yes.
22  Q.   Does that business record certification, Exhibit 1, apply
23  to Exhibits 2, 2A, and 3?
24  A.   Yes.  It would apply to the entire search warrant.
25  Q.   And for those same exhibits I just referenced, are those
```

1    fair and accurate representations of the material you received

2    from Facebook?

3    A.    **Yes, they are.**

4          MR. PALOMO:  Your Honor, the Government moves

5    Exhibits 1, 2, 2A, and 3 into evidence.

6          THE COURT:  Any objection?

7          MR. TAVITAS:  No, Your Honor.

8          THE COURT:  They're admitted.  Let me turn the screen

9    on.

10   **BY MR. PALOMO:**

11   Q.    So starting with Exhibit 1, what is this?

12   A.    **That's the Certificate of Authenticity that was provided**

13   **by Facebook with the search warrant return for the Ashley**

14   **Campbell account.**

15   Q.    Now, I'm going to zoom in so that we can see it a bit more

16   clearly.  Can you highlight the account identifier in this

17   business record certification.  And if you need to hit "Clear,"

18   it should be on the menu there.

19         THE COURT:  Why don't you just clear it.  I'm not

20   sure he knows.

21         THE WITNESS:  Sorry about that.

22         MR. PALOMO:  There we go.  Try again.

23         THE WITNESS:  (Witness complies.)

24         MR. PALOMO:  And, actually, tell you what.  Let me --

25         THE COURT:  It's easier to use the pen and let him

ANTHONY STACK - DIRECT

1   circle it, that kind of thing.

2          **MR. PALOMO:**  Yes, sir.

3   **BY MR. PALOMO:**

4   Q.   This is the account identifier for the Ashley Campbell

5   account?

6   A.   **Yes, it is.**

7   Q.   I'm going to direct your attention next to Exhibit 2.

8   What is this?

9   A.   **That's the subscriber information for the Ashley Campbell**

10  **Facebook account.**

11  Q.   I'm going to start by highlighting the first four digits

12  of this right here.  What is this?

13  A.   **That is an IP address that was associated with the Ashley**

14  **Campbell Facebook account.**

15  Q.   Is that IP address also found on that AT&T return we

16  looked at a few minutes ago?

17  A.   **Yes, it is.**

18  Q.   Is that the one associated with the Defendant's residence?

19  A.   **Yes, it is.**

20  Q.   I'm going to page 2.  We'll notice there's some redacted

21  material there.  Can you just briefly describe what is

22  redacted.

23  A.   **It's a naked image, but it is not associated with any**

24  **victims in this case.**

25  Q.   Looking a bit farther down, is this right here the user

1   name for this account?

2   A.   **Yes, it is.**

3   Q.   And I think I'm going to have to zoom out a bit.

4        Is this registered email address the registered email

5   address for the Ashley Campbell account?

6   A.   **Yes, it is.**

7   Q.   And last for this exhibit, I'm going to show you the

8   mobile device type here.

9        What device is that there?

10  A.   **That is for a Samsung Galaxy cellphone.**

11  Q.   I'm going to reference Government's Exhibit 3 next.  What

12  is this document?

13  A.   **Those are IP addresses that were associated with images**

14  **that were sent from the Ashley Campbell Facebook account.**

15  Q.   I'm going to first go to page 27, and I'm going to

16  highlight the entry for 2019-10-20.

17       Can you first describe how Facebook records the date and

18  time.

19  A.   **Facebook always provides their stuff.  They record it in**

20  **UTC time.**

21  Q.   And UTC, that's "Universal Time Coordinated"?

22  A.   **Yes, it is.**

23  Q.   I had to look that up, so.  How many hours ahead from

24  Central Standard Time is UTC?

25  A.   **At this time of the year, it's five hours.**

1  Q.   And what time and date would this particular entry be in
2  Central Standard Time?  Sorry to put you on the spot and make
3  you do math.
4  A.   **Sure.  Not a problem.  That would be October 19th of 2019,**
5  **at 11:10 p.m.**
6  Q.   So even though this is recording time in UTC on
7  October 20th, this would actually in Central Standard Time be
8  October 19th, if I understand you correctly?
9  A.   **That's correct.**
10  Q.   And what IP address shows up on that particular date?
11  A.   **99.90.12.39.**
12  Q.   Where else have you seen that IP address?
13  A.   **That's the IP address that we had subpoenaed AT&T for.**
14  **It's on the AT&T subpoena return that's associated with the**
15  **Lorenzo Johnson's residence.**
16  Q.   What does the "attachment sent" mean?
17  A.   **That means that there was something sent from this user to**
18  **another -- to another user.**
19  Q.   I'm going to go to page 40 of the same document.
20     I'm going to zoom in a bit more, so everybody can see it a
21  bit more clearly.  I'm going to highlight right here.  Which
22  date and time is this entry for?
23  A.   **This is 10/16 of 2019, at 23:19 hours UTC time.**
24  Q.   So in Central Standard Time.  Would that still be on
25  October 16th?

1   A.   **It would still be on October 16th.  It would be at**

2   **7:19 p.m.**

3   Q.   Again, with that same "attachment sent," is that what you

4   just described for that previous entry?

5   A.   **That's correct.**

6   Q.   Which IP address do you see here?

7   A.   **99.90.12.39.**

8   Q.   Is that the IP address for the Defendant's residence?

9   A.   **Yes, it is.**

10   Q.   I'm going to turn your attention next to page 54 of this

11   same document.

12        So I'm highlighting towards the bottom.  What date and

13   time is this activity for?

14   A.   **9/3 of 2019, at 20:20 hours UTC time.**

15   Q.   For, again, Central Standard Time, would that still be on

16   September 3rd?

17   A.   **Yes, it would.**

18   Q.   Which IP address is that activity associated with?

19   A.   **99.90.12.39.**

20   Q.   Again, is that the same IP address associated with the

21   Defendant's residence?

22   A.   **Yes, it is.**

23   Q.   Have you had an opportunity to review the Indictment in

24   this case?

25   A.   **I have.**

ANTHONY STACK - DIRECT

1    Q.   Are these dates that we just discussed the same dates

2    alleged in the Indictment?

3    A.   **Yes, they are.**

4    Q.   Next, I'm going to show you Exhibit 4.

5         I guess before I put it up on -- Here we go.

6         So I'm showing you Exhibit 4.   What is this?

7    A.   **These are Facebook messages from the search warrant**

8    **returned for the Ashley Campbell account, messages between**

9    **Ashley Campbell and Neci Taylor.**

10   Q.   What are the subjects of these communications?

11   A.   **As I said before, they're sexual in nature regarding the**

12   **sexual abuse of children and producing pictures and videos of**

13   **those assaults for money.**

14   Q.   For Exhibit 4, are these all of the communications between

15   the Ashley Campbell account and Neci Taylor?

16   A.   **No, not all of them.**

17   Q.   What messages have been removed from this exhibit?

18   A.   **Stuff that's not relevant to the counts in question.**

19   Q.   So this exhibit only shows the Ashley Campbell account

20   discussing topics involving the sexual exploitation of

21   children?

22   A.   **That's correct.**

23   Q.   And is this exactly how the messages appear in Facebook

24   when you received them from Facebook?

25   A.   **No.  When we receive them from Facebook, they're in a**

1    different format.  We usually put them in this format just so

2    they're easier to read.  It's a bubble format that makes it

3    easier to follow along.

4    Q.   So you said "bubble format."  This would look a little bit

5    more like what the user sees when they're communicating?

6    A.   **Correct, like what you would normally see on your phone**

7    **when you're communicating on Facebook.**

8    Q.   Is this, nevertheless, a fair and accurate representation

9    of the material you received from Facebook?

10   A.   **Yes.  The content stays the same.**

11   Q.   I'll also note there are some sub-exhibits, so 4A, B, C,

12   and so on.  Have you received those sub-exhibits?

13   A.   **I have.**

14   Q.   Those are going to be in a slightly different format;

15   correct?

16   A.   **Yes.  They would be in the original format that we**

17   **received in the search warrant return.**

18   Q.   So this would allow the jury to see maybe something a

19   little bit more in line with what the user sees on their screen

20   for the communications, the main document; is that right?

21   A.   **That's correct.**

22   Q.   And then the sub-exhibits are exactly as they were

23   received from Facebook?

24   A.   **That's also correct.**

25   Q.   So with Exhibit 4 and its alphabetized sub-exhibits, are

ANTHONY STACK - DIRECT

```
 1   these fair and accurate representations of the communications
 2   between Ashley Campbell and Neci Taylor?
 3   A.    Yes, they are.
 4              MR. PALOMO:  Government moves to admit Exhibit 4 into
 5   evidence, Your Honor.
 6              THE COURT:  Any objection to 4?
 7              MR. TAVITAS:  No, Your Honor.
 8              THE COURT:  Four is admitted.  Let me display it
 9   here.
10              MR. PALOMO:  Your Honor, before publishing, we're
11   going to do the same with Exhibits 5, 6, and 7.
12              THE COURT:  Any objection to 5, 6, and 7,
13   Mr. Tavitas?
14              MR. TAVITAS:  If I could just look for a moment, Your
15   Honor.
16              THE COURT:  Sure, of course.
17        (Brief pause.)
18              MR. TAVITAS:  No objection, Your Honor.
19              THE COURT:  So that was 5, 6, and 7, as well; is that
20   what you just said?
21              MR. PALOMO:  Yes, Your Honor.  And 5, 6, and 7 also
22   have sub-exhibits that are similar in the way we just described
23   for 4 and its sub-exhibits.
24              THE COURT:  Okay.  So 4, 5, 6, and 7 are now all
25   admitted.
```

1          **MR. PALOMO:**  Yes, Your Honor.  We request permission

2    to publish Exhibit 4.

3          **THE COURT:**  Sure.

4          **MR. PALOMO:**  And the plan, Your Honor, is for me to

5    read the Ashley Campbell communications and for the witness to

6    read the Neci Taylor communications.

7          **THE COURT:**  Fair enough.  You may proceed.

8    **BY MR. PALOMO:**

9    Q.   Officer Stack, can you see all of this here?  I don't want

10   to cut anything off but --

11         So if I'm going to start off with the first communication

12   on August 29th, Ashley Campbell says:

13         *What's up sexy?*  And then sends an emoji.

14   A.   *Hi.*

15   Q.   *You like girls?*

16   A.   *Yes.*

17   Q.   *Where you stay?*

18   A.   *Chicago, Melrose Park.*

19   Q.   *You single?*

20   A.   *Sum' like that.*

21   Q.   *What that mean?*

22   A.   *Open relationship.*

23   Q.   *Are you freaky?*

24   A.   *Yes.*

25   Q.   *You ever did a threesome?*

ANTHONY STACK - DIRECT

1    A.    Yes.

2    Q.    Two guys or two girls?

3    A.    Me and two guys and me and just three females.

4    Q.    So you a semi freak LOL.

5          **THE WITNESS:**  I can't see the very bottom of the

6    page.

7    A.    LOL and a female orgy.

8    Q.    You like getting your pussy ate?

9    A.    Yes.

10   Q.    Do you squirt or cream?

11   A.    Both.

12   Q.    Oh.  And an emoji.

13         Could you briefly describe what an emoji is?

14   A.    **An emoji is an attachment you're going to put along with a**

15   **text message, a smiley face, a type of a fruit, a heart, things**

16   **of that nature.**

17   Q.    So is that image of a smiley face with stars on it, is

18   that an emoji?

19   A.    **Yes.**

20   Q.    And then what does Neci Taylor respond with?

21   A.    Can you send me a pic of you.

22   Q.    Ashley Campbell says:  What you want to see?

23   A.    Just the face shot.

24   Q.    And Ashley Campbell removes the message.

25   A.    Why did you delete it?

ANTHONY STACK - DIRECT

1   Q.   *I almost sent in something nasty LOL.*

2        What does "LOL" mean?

3   A.   **"Laugh out loud."**

4        **Neci Taylor then sends a picture.**

5        *So do you like females in general or guys and girls?*

6   Q.   *Both.*

7   A.   *What do most prefer?  Where do you live?*

8   Q.   *I stay in Indiana, and I love dick but love pussy.  Do you*

9   *have kids?  He have a little dick?*

10  A.   *Yes.*

11  Q.   *I like little dicks.  I can play with them and deep*

12  *throat.*

13  A.   *And how long would I have to wait before I can put you on*

14  *my face so I can make you squirt?*

15  Q.   *Can you find a way to Indiana?*

16  A.   **Neci sent a photo.**

17  Q.   Is that photo related to child exploitation?

18  A.   **It is not.**

19  Q.   Has it been removed from this conversation here?

20  A.   **Yes, it has.**

21  Q.   Ashley Campbell says:  *LOL.  You said a monster?*

22  A.   *Yeah.*

23  Q.   *You think that's a monster?*

24  A.   *He just not up RN.*

25  Q.   *How many inches is he hard?*

ANTHONY STACK - DIRECT

1    A.    *He can get up to six, eight inches.*

2    Q.    *Oh, that 16 YO got a big dick.*

3          And then Ashley Campbell sends a penis picture.  Have you

4    seen this image before?

5    A.    **I have.**

6    Q.    Is this the same image depicted in Exhibit 4A?

7    A.    **Yes, it is.**

8    Q.    So what does Neci say next at the top?

9    A.    *Yep.*

10   Q.    Ashley Campbell replies:  LOL.  *So if I do it, what you*

11   *going to do for me?*

12   A.    *Eat that MF and finger you until you squirt.*

13   Q.    *I'm doing you a favor with your guy.  You going to do a*

14   *favor for me.*

15   A.    *What favor?*

16   Q.    *You down to be real nasty?*

17   A.    *Like how?*

18   Q.    *I got a fetish.*

19   A.    *What kind of fetish?*

20   Q.    *I like young boy and girl.  I want to watch you give my*

21   *little female secret head.  You down?*

22   A.    *When?*

23   Q.    *She young, though.*

24   A.    *How young?*

25   Q.    *I always wanted to watch someone eat her out.*

ANTHONY STACK - DIRECT

1   A.    As long as I'm not being recorded.

2   Q.    You won't.  I babysit her on weekdays.  She 12.  Me and

3   her got a bond.  She won't say nothing.

4   A.    Okay.

5   Q.    What you going to do to her little pussy?

6   A.    Make he come and squirt.

7   Q.    She come but don't squirt.

8   A.    I have my ways, and he mother allow her to have sex at 12?

9   Q.    No, she don't know.  I been playing with her pussy since

10  seven.

11  A.    Aw, okay.  And she likes it?

12  Q.    She used to watch me walk around naked and wanted to know

13  about sex.  Yes, she do.

14  A.    Well, I can understand it.  Most kids learn at a young age

15  anyway.

16  Q.    She even got hair on her pussy.  I want to watch you lick

17  her good.

18  A.    I can't see the bottom:  Okay.

19  Q.    Can you put her face in your pussy?  Make her eat you.  Be

20  gentle.

21  A.    I'll just do her and I'll be gentle.

22  Q.    I want you to let her do you.

23  A.    If she doesn't want, I'm not going to force her.

24  Q.    That's the fun part.  She will.  You never mess with a

25  young girl?  And then Ashley Campbell calls Neci and says:

1    *Sorry.*

2    A.   It's okay.

3    Q.   *But I bet you going to eat it good.  When we going do it?*

4    *Hello?*

5    A.   *I'm sorry.  I'm at work.*

6    Q.   *How's works?*

7    A.   *Boring.*

8    Q.   So here we see Ashley Campbell sending another picture,

9    and I'm going to reference Exhibit 4B.  Is this that same

10   picture --

11   A.   **Yes, it is.**

12   Q.   -- that Ashley Campbell sent?

13   A.   **Yes.**

14   Q.   Who are these children?

15   A.   **Those are Dominique Harper's daughters.**

16   Q.   *We going to give them head once they momma drop them off,*

17   *okay?*

18   A.   *They cute.*

19   Q.   *Yeah, we going do them.  Is your man home?*

20   A.   *No, he's at work.*

21   Q.   *Can I come over?*

22   A.   *I'm at work too, but I get off at 7.  What's up?*

23   Q.   *Will he be home by then?*

24   A.   *I get off before he does.*

25   Q.   *I need you to give this little boy head while I eat your*

ANTHONY STACK - DIRECT

1   *pussy, please.*

2   A.   *How old is he?*

3   Q.   *Two.  Won't nobody know.*

4   A.   *A two-year-old?*

5   Q.   *He can't tell nobody.  I eat you and you suck and play*

6   *with his dick.*

7   A.   *Oh, my.  So you tell me a two-year-old wouldn't even know*

8   *what it feel like?*

9   Q.   *No.  Well, he felt hard though because I train him.  He*

10  *won't say shit.  Are you freaky?  Bae?  Guess not.*

11      *And then Ashley Campbell calls Neci Taylor.*

12  A.   *Sorry.  It's real busy at work.*

13  Q.   *Are you going to do it?  Bae?*

14  A.   *When?*

15  Q.   *Tonight.*

16  A.   *How?*

17  Q.   *I come to you.  I will bring him with.  You got to do a*

18  *good job, boo.*

19  A.   *As long as I'm not being recorded.*

20  Q.   *You won't be.*

21  A.   *And what do I get out of this?*

22  Q.   *Is this the freakiest thing you ever did?*

23  A.   *Yes.*

24  Q.   *You get to taste me pussy and fuck me.*

25  A.   *It will cost you.*

1     *Q.   You going to be addicted to little boys.  Watch.  You*

2     *going anyways want to do it.  And how much?*

3     *A.   400.*

4     *Q.   400, I can record.  Then if not, 150.*

5     *A.   Where we going be at?*

6     *Q.   Can we be at your crib?*

7     *A.   What time you talking about?  Because I don't want my*

8     *husband to come home and he be like WTH.*

9     *Q.   What time you off and how you going to suck his little*

10    *dick, hands or no hands?*

11    *A.   I'm trying to find out now what time I leave.*

12    *Q.   What if he walk in?  LOL.  Will he leave you or he sprung?*

13    *A.   That's what I'm afraid of.*

14    Q.   At this point, Officer Stack, had you began communicating

15    as Neci Taylor?

16    A.   **No.  This was not me.**

17    Q.   So the person, to your knowledge, typing the Neci Taylor

18    messages is the actual Neci Taylor?

19    A.   **That's correct.**

20    Q.   Okay.  To resume at September 3rd, at 11:14 p.m.:

21        *LOL.  Oh, you got to make the baby come though.  Can you*

22    *do it?*

23        And then there are more emojis showing eyes.  Ashley

24    Campbell calls Neci and then says:  *Good morning.  WYA.*

25        What does "WYA" mean?

ANTHONY STACK - DIRECT

1   A.   **"Where you at?"**

2   Q.   *Why?  WYO?*

3        What does that mean?

4   A.   **"What you on?"**

5   Q.   Can you say that again.  I didn't hear.

6   A.   **"What you on?"**

7   Q.   What does Neci Taylor reply with?

8   A.   *Girl, at work, sick ASL.*

9   Q.   Just an acronym there, what does "ASL" mean?

10  A.   **"ASL" is short for "as hell."**

11  Q.   So she's saying:  Girl, at work, sick as hell?

12  A.   **Sick as hell.  Correct.**

13  Q.   Ashley Campbell replies:  *Poor baby.  Come help me*

14  *babysit.*

15  A.   *But how can I make that 2,000 you always posting about?*

16  *And I just said I'm at work.*

17  Q.   *You didn't want to be my little pervert buddy, so IDK.*

18       "IDK" means "I don't know;" correct?

19  A.   **Correct.**

20  Q.   *When you ready to be real nasty, let me know.  I got paid*

21  *2,000 -- or I got paid 2,000 to suck a baby boy dick for*

22  *10 minutes.*

23  A.   *Wow.*

24  Q.   *You want to get put on?*

25  A.   *Yes.*

1    Q.   WYA?  Where you at right now -- I'm sorry.  Where you at

2    now?

3    A.   But how?  I still can't do anything.  I'm still kind of

4    bleeding from this whole thing and I'm at work.

5    Q.   There's a redacted portion there.  Is that portion that's

6    redacted in any way relevant to child exploitation?

7    A.   **It is not relevant, no.**

8    Q.   So Ashley Campbell replies:  You just suck the baby dick.

9    WYA?  Where you at?  You have to moan while you do it.

10   A.   I'm at work right now.

11   Q.   You going to do it?

12   A.   How and where?  And you can't record me.

13   Q.   I won't.  You can run my pussy while you do it?

14        And then Ashley Campbell removes the message.

15   A.   Yeah.  I can.  But where?  And it's gonna cost you.

16   Q.   You want the one-year-old or the two-year-old?

17   A.   One-year-old or a two-year-old.  Is you serious?

18   Q.   Yes.  Pick one.

19   A.   The two-year-old.  But how are you keeping the kids from

20   saying anything?

21   Q.   Easy.

22        And then Ashley Campbell sends an image.  Have you

23   reviewed that image?

24   A.   **I have.**

25   Q.   I'm showing you Exhibit 4C.  Is this that same image that

ANTHONY STACK - DIRECT

1    Ashley Campbell sent to Neci Taylor?

2    A.    **Yes, it is.**

3    Q.    What does this depict?

4    A.    **It depicts a male infant's penis.**

5    Q.    Just to explain what's happening here, I see that the

6    image is cut off in the middle.  Is that still a fair and

7    accurate representation of the image received -- sent by Ashley

8    Campbell?

9    A.    **Yes, it is.**

10   Q.    So there's another picture here sent at 10/5/19 at

11   10:01 p.m.  What is this image?

12   A.    **That's another picture of an infant male's penis.**

13   Q.    I'm going to show you Exhibit 4D.  Is this that same

14   image?

15   A.    **Yes, it is.**

16   Q.    What does this image depict?

17   A.    **It's an infant's penis, a closeup image of it.**

18   Q.    Who is this infant?

19   A.    **This is John Doe No. 3.**

20   Q.    Listed from the Indictment?

21   A.    **That's correct.**

22   Q.    And John Doe No. 3 is in the Indictment for the Dominique

23   Harper account?

24   A.    **That is correct.**

25   Q.    Ashley Campbell says:  *Which one?*

1   A.   *What you think Imma say sum'?  I'm not stupid.  I'm just*

2   *curious.  How do you get the kids to do this?  I mean, I want*

3   *to know how it can be done.  You not talking to me now?*

4   Q.   So I'm going to skip ahead to communications beginning on

5   October 6th, 2019, at 3:08:04 p.m.  And, again, I will remind

6   you that's UTC time.

7   A.   *Yeah.  And I didn't think about that.*

8   Q.   *Scary.  You should start babysitting and making videos.*

9   *Get paid thousands of dollars.  I could put you on.*

10  A.   *How is that being scary?*

11  Q.   *Just playing.  You going to start the babysitting job?*

12  *You make money both ways.*

13  A.   *I'm thinking about it.*

14  Q.   *You going have to learn how to get them to be freaky.*

15  *Start up a low underage porn and make so much money.  You could*

16  *do boys and girls.  Find a guy that won't talk so he can put*

17  *his dick in little girls.  You think you can find a guy?*

18  A.   *I look into it, but I'll message you when I get to work.*

19  Q.   *WYA?  Where you at?*

20       And then Ashley Campbell sends another image.  Is this the

21  same image we saw in sub-exhibit 4C, I believe?

22  A.   **Yes, it is.**

23  Q.   And there are some other images.  What do those other

24  images depict?

25  A.   **Those are images of the same child in the -- in the first**

1    **image, closeup images of an infant's penis.**

2    Q.   Ashley Campbell says:  *You think you can make him hard?*

3    A.   *Yeah.  WYD?  What you doing?*

4    Q.   *Chillin'.  How about you?*

5         And Ashley Campbell sends that same image again.

6         We're going to skip ahead now to communications beginning

7    on October 10th, 2019, and if you could start at the

8    2:32 p.m. message.

9         **MR. TAVITAS:**  Sir, can you give me a second --

10   October 10th at what time, again?

11        **MR. PALOMO:**  October 10th, at 2:32:42.

12        **MR. TAVITAS:**  We're there.  Thank you, sir.

13   A.   *Finna get ready for work.*

14   Q.   So Ashley Campbell sends a screenshot.  What is this

15   screenshot?

16   A.   **If you can go back to the previous page, please.**

17        **It's a screenshot of a BMO Harris banking account.**

18   Q.   And I'm going to direct your attention to sub-exhibit 4F.

19   Is this that same screenshot?

20   A.   **Yes, it is.**

21   Q.   What does Neci Taylor say next?

22   A.   *I see.  How old is she?*

23   Q.   *Twenty-one.  I need something nasty for her to do.*

24   A.   *Like?*

25   Q.   *I need to come up with something.*

1   A.   *I don't know.*

2   Q.   Ashley Campbell sends another screenshot.  What does this
3   depict?

4   A.   **It's a screenshot of Facebook messages with a user by the**
5   **name of "Queen."**

6   Q.   Does this depict the same images that we just reviewed in
7   sub-exhibits?

8   A.   **Yes.  Yes, it does.**

9   Q.   The one on the right, does that depict John Doe 3?

10  A.   **Yes.**

11  Q.   Ashley Campbell resumes:  *She already sucked the dark skin*
12  *baby.*

13  A.   *Oh.  All right.*

14  Q.   *I need something else.  You got any ideas?*

15  A.   *Not really.  I mean, ask her what she likes.  You said you*
16  *got 2,000 to suck a baby dick for 10 minutes.  How can I make*
17  *that money?*

18  Q.   Let's pause there.  Who's behind the keyboard for Neci
19  Taylor right then?

20  A.   **That is myself when I took over the Neci Taylor account.**
21  **So I'm doing the communications from this point on.**

22          **MR. TAVITAS:**  Excuse me.  Which one was that, again?

23          **MR. PALOMO:**  Right now, we are at 10/14 at
24  10:48 p.m., and then the following page, the next message,
25  which would be -- so at 10/14, then three days later.

1    Q.   The Neci Taylor account, can you repeat, please.

2    A.   *You said you got 2,000 to suck a baby dick for 10 minutes.*

3    *How can I make that money?*

4    Q.   Ashley Campbell replies:  *Can you find a baby?  Right now*

5    *I got a baby girl.*

6    A.   *Do the girl pay the same?*

7    Q.   *You going to eat her?  Little girl's pee when they come.*

8    *If you can finger her or find someone who will put they dick*

9    *in her.*

10   A.   *I can do whatever makes me money as long as she don't say*

11   *anything.*

12   Q.   *She won't.  Can you find somebody with kids you can sneak*

13   *and get pics of?*

14   A.   *No.  I was gonna put up ads for babysitting, but that*

15   *takes time and I need money now.*

16   Q.   *Still do that because if you get someone, that's a lot of*

17   *money.  You going to finger her and eat her pussy.*

18        And then Ashley Campbell calls Neci.  What does Neci say

19   next?

20   A.   *How old?  And she won't tell, right?*

21   Q.   *Nope.*

22   A.   *Okay.  So I can do he girl and get money now and put ads*

23   *up for babysitting?  If I can sneak picks how I get paid for*

24   *that?*

25   Q.   Why are you asking questions this way?

---

Angela Phipps, RMR, CRR, CSR
(219) 852-3616 - Angela_Phipps@innd.uscourts.gov

ANTHONY STACK - DIRECT

1    A.    **I'm trying to figure out whether or not the user of the**

2    **Ashley Campbell account has access to children like they**

3    **purported to have.**

4    Q.    Resuming at 5:43 p.m.  Ashley Campbell replies:  *Each*

5    *pic 50.*

6    A.    *That ain't no kid.  I get 50 for that too?*

7    Q.    *If it's a relative.  These are just pic -- These are just*

8    *sent pics submitted to us.  We watched a girl eat her niece*

9    *pussy.  Things like that get paid.*

10   A.    *So these pics don't pay?*

11   Q.    *Sometimes.  Only if you doin the dick or it's a kid or*

12   *teen, then teen boys.*

13   A.    *Okay.  Just askin.  Cuz they adults?  And I could find*

14   *lots of guys to take picks of if they pay.*

15   Q.    *You need shit like kids.*

16         And then Ashley Campbell sends an image.  I'm going to go

17   to sub-exhibit 4G.  Is this the image that the Ashley Campbell

18   account sent?

19   A.    **Yes, it is.**

20   Q.    What does this depict?

21   A.    **That's a close-up image of a female infant's vagina.**

22   Q.    Who is this child?

23   A.    **This is Jane Doe 1.**

24   Q.    Is this Jane Doe 1 referenced in Count Two of the

25   Indictment?

ANTHONY STACK - DIRECT

1  A.   **It is.**

2  Q.   And that's the count that pertains to Jasmine Stanley?

3  A.   **Yes, it is.**

4  Q.   Now, there are other similar images sent.  Are these also

5  included in the sub-exhibit that we just referenced?

6  A.   **Yes, they are.**

7  Q.   What does this top image depict?

8  A.   **It is a picture of Jane Doe No. 1 with an adult female**

9  **spreading the vagina open of the infant child.**

10  Q.   Does that depict basically the same thing?

11  A.   **Yes.  With someone's finger on the vagina of the infant**

12  **child.**

13  Q.   *Look at here, little pussy.*

14  A.   *Damn, she young.  She pay more?*

15  Q.   *You get shot like this, hundreds.  If you can get video,*

16  *you -- she the mom touching her.  She make good money off her*

17  *baby.*

18  A.   *Almost wish had a baby, make more -- make money when they*

19  *don't know.*

20  Q.   *Exactly.  That why babysitting is easy.  Parents gone.*

21  *Would you eat her pussy?*

22       And then Ashley calls Neci.

23  A.   *For money?  Yes.*

24  Q.   *You put your finger in it?*

25  A.   *Yeah.  What about the girl you got now?*

1   Q.   Why did you ask that question?

2   A.   **He had already talked about that there was a female**

3   **already in her life at that point.**

4   Q.   So is that to see if you can find any of the victims of

5   these images?

6   A.   **Yeah.  He purported to already have someone in real, so I**

7   **was just trying to -- if he had someone in real, then maybe he**

8   **would be able to let me know that.**

9   Q.   Ashley Campbell continues:  *You so freaky.  And that*

10  *was her.*

11  A.    *I thought that mom just sent you pics.*

12  Q.    *I made the mom do it all when she was here.  She ate her*

13  *pussy and fingered her.  I got numb cream* (phonetic) *if we can*

14  *find a smaller dick.*

15      And then Ashley Campbell sends the same image.  Which

16  image is this?

17  A.   **This is Jane Doe No. 1.**

18  Q.   I'm going to skip ahead now to October 18th, 2019, at

19  9:33 p.m.

20  A.    *So take one now.*

21  Q.    *Why?  You just want to come here and take your own?*

22  A.    *I do, but I don't believe you now.  I think you play, and*

23  *take a pic of that baby and hold up three fingers so I know you*

24  *for real.*

25  Q.    *We done talking.  You full of shit.  You just trying to*

1    *get free pictures.*

2    A.   *I ain't asking for nasty, just so I know you real.*

3    Q.   *Bye.  You playin'.  Can't believe you.*

4    A.   *Man, you so full of it.  You can't verify, then you*

5    *playin'.  I'm taking risk.*

6    Q.   Can you explain what's going on in this part of the

7    messages?

8    A.   **So at this part of the messages, the user of the**

9    **Ashley Campbell account was purporting to have an infant child**

10   **with him or her, the user of the account, at a residence.**

11   **They had sent me an image of this child, but I had already**

12   **received this image or seen this image previously in the**

13   **conversation.**

14   **I wanted to know that this was something that he wasn't**

15   **just making up and if he actually had the child there.  So**

16   **that's a technique that we use, where we ask them to take a**

17   **picture and hold up two or three fingers so it can't be**

18   **something that's in their gallery or something previously.**

19   **It's something that they have to take live right then and**

20   **there.**

21   Q.   So Ashley Campbell continues:  *You took a risk when you*

22   *agreed to do it.  Now if I was going to BS, I would just expose*

23   *you with the things that you said to me already.  Don't play*

24   *with me.  We have all our combos and what's the screenshot.*

25   Here, when he's saying "combos," what do you believe he's

1    referencing?

2    A.    **I believe he went to say "convos," like conversations.**

3    Q.    *I have all of our convos, conversations, and what's the*

4    *screenshot.  Yeah, you quiet now.*

5    A.    *Waiting for proof.*

6          **And then Neci Taylor sends a thumbs-up.**

7    Q.    The Ashley Campbell account sends another image.  What is

8    this?

9    A.    **This is a screenshot of communication between Neci Taylor**

10   **and Ashley Campbell, the user of the Ashley Campbell account.**

11   Q.    And is this also one of the sub-exhibits?

12   A.    **Yes, it is.**

13   Q.    *Guess I just going* -- I'm sorry.  *Guess I just have to*

14   *expose you since you don't believe me.*

15   A.    *Haha.  Go ahead and call the cops.  You get exposed too.*

16   Q.    *Okay.  Say less.  Watch this.  You either do what I say or*

17   *I'm exposing you.  You done playing?*

18   A.    *Man, we both done wrong, so I don't know why you trippin'.*

19   Q.    So, next, I'm going to show you Exhibit 8.

20         And, Your Honor, these are other Facebook communications

21   that are going to be admitted into evidence in a similar way.

22   So we can show them to the witness now or just have defense

23   counsel review pending any objection.

24         **THE COURT:**  Okay.  Why don't we take a recess at this

25   time.  We've been at it for about an hour and, I don't know,

```
 1  45 minutes.  Maybe you can just talk over the break to sort
 2  it out.
 3       All right.  Ladies and gentlemen, remember the admonitions
 4  I've been giving you.  We're going to take about a 15-minute
 5  break to stretch your legs.  Don't discuss the case amongst
 6  yourselves over this break, and, of course, you have to
 7  continue to keep an open mind.
 8       So, with that, you can follow Lenny back to the jury room.
 9  So about 15 minutes.
10       (Jury out at 3:19 p.m., and a recess was taken.)
11       (Proceedings resumed in open court at 3:45 p.m.)
12       (Jury not present.)
13            COURTROOM DEPUTY:  All rise.
14            THE COURT:  You can be seated.
15       Mr. Tavitas, did you want to talk about a scheduling
16  issue?
17            MR. TAVITAS:  Yes, Your Honor.  Just speaking with
18  the Government and just trying to figure out how long Your
19  Honor wants to -- I think the Government believes they may have
20  about 45 more minutes with this witness, and then I'm trying to
21  figure out through cross, and -- so how long Your Honor was
22  going to go today.
23       And question number two, I've been kind of working with
24  the marshals, is that I believe Your Honor indicated maybe at
25  the pretrial conference that we normally start around 9:00,
```

ANTHONY STACK - DIRECT

```
 1    Your Honor?
 2              THE COURT:  Yeah.
 3              MR. TAVITAS:  Okay.  Is that the case, then?  Because
 4    I came this morning a little after 8:00 to try to see
 5    Mr. Johnson, and the door was locked.  So I corresponded with
 6    the marshals.  They told me they'll bring him here by 8:00.
 7    I've got their cellphone.  So that will give Mr. Johnson and I
 8    plenty of time to talk before we resume tomorrow.
 9              THE COURT:  That's great.  If it's another 45
10    minutes, we'll probably break at that time, so 4:30 so that you
11    could have some time to talk to your client.
12              MR. TAVITAS:  I appreciate it, Your Honor.
13    Thank you.
14              THE COURT:  Also, tomorrow morning, I have a
15    sentencing at 8:30 and another one at noon.  That shouldn't
16    interrupt what you're doing.  Just to let you know from a
17    scheduling point of view.
18         Also, the one thing I wanted to tell you guys.  I have a
19    bench trial that's following right on the heels of this.  So,
20    hopefully, by Friday, I want you guys to give me an estimate
21    because I need to tell those parties when they're in the hopper
22    about, you know, where you think this thing is going to end.
23    Okay?
24              MR. PALOMO:  If we're going at this pace, Your Honor,
25    there's a possibility the Government closes by Friday
```

```
 1   afternoon.
 2              THE COURT:  Oh, okay.
 3              MR. PALOMO:  Or rests by Friday afternoon and, you
 4   know, take it after that.
 5              THE COURT:  Okay.  So then that gives me some relief
 6   that I'm not going to be holding those folks up, because that
 7   trial is supposed to start on Wednesday morning in South Bend.
 8   So it sounds to me like we're fine.  Okay.  Good enough.  All
 9   right.  You want to call the jury.
10        (Jury in at 3:45 p.m.)
11              THE COURT:  Okay.  Welcome back.  You may be seated.
12        Mr. Palomo, you may continue with your examination.
13   BY MR. PALOMO:
14   Q.   Officer Stack, have you had an opportunity to review
15   Government's Exhibit 8, 9, 9A, and 10?
16   A.   I have.
17   Q.   What are those?
18   A.   Those are the Facebook returns for the Lorenzo Johnson
19   Facebook account.
20   Q.   And did you receive those after requesting a search
21   warrant, or did you come into possession of those pursuant to a
22   search warrant for that account?
23   A.   Yes.
24   Q.   I'm going to show you Government Exhibit A.
25        Your Honor, this has not yet been admitted into evidence.
```

ANTHONY STACK - DIRECT

```
 1              THE COURT:  Okay.
 2    BY MR. PALOMO:
 3    Q.    Can you see that?
 4    A.    Yes, I can.
 5    Q.    This is Exhibit A.  What is this?
 6    A.    It's a Certificate of Authenticity from Facebook for the
 7    Lorenzo Johnson Facebook return.
 8    Q.    I'm going to highlight here a number.  Do you recognize
 9    that number?
10    A.    Yes.
11    Q.    What is it?
12    A.    That's the Facebook ID for the Lorenzo Johnson Facebook
13    account.
14    Q.    Turning your attention now to Government's Exhibit 9, what
15    is this?
16    A.    That is the subscriber page for the search warrant return
17    for the Lorenzo Johnson Facebook account.
18    Q.    Does this have that same account identifier?
19    A.    Yes, it does.
20    Q.    Showing you Exhibit 9A, what is this?
21    A.    These are cookies associated with that same Lorenzo
22    Johnson search warrant return.
23    Q.    And Exhibit 10, what is this?
24    A.    These are IP addresses that were associated with
25    attachments that were sent through the Lorenzo Johnson Facebook
```

ANTHONY STACK - DIRECT

1    **account.**

2    Q.   So going back to Exhibit 8, is that business records

3    certification applicable to Government Exhibits 9, 9A, and 10

4    for the Lorenzo Johnson Facebook account?

5    A.   **That's correct.  They would apply to the entire account.**

6          **MR. PALOMO:**   The Government moves into evidence

7    Exhibits 8, 9, 9A, and 10, Your Honor.

8          **MR. TAVITAS:**   No objection, Your Honor.

9          **THE COURT:**   Okay.  Those are admitted.

10          **MR. PALOMO:**   Request permission to publish.

11          **THE COURT:**   Mr. Palomo, if you want to remove your

12    mask, you're welcome to do that, but, again, I'm not requiring

13    you to.

14          **MR. PALOMO:**   I forget sometimes, Your Honor.

15       I request permission to publish, Your Honor.

16          **THE COURT:**   Yeah.  Let me turn the screen on.

17          **MR. PALOMO:**   Kind of zooming in there, making sure

18    everybody in the jury can see it well.

19    Q.   What's that number that I just highlighted in Government

20    Exhibit 8?

21    A.   **That's the Facebook ID for the Lorenzo Johnson Facebook**

22    **account.**

23    Q.   Is this that same Facebook ID in Government Exhibit 9?

24    A.   **Yes, it is.**

25    Q.   And we'll notice that, underneath that account identifier,

ANTHONY STACK - DIRECT

```
 1    it says a name.  What is that name?
 2    A.    Zoskie.2Petty.  (Phonetic.)
 3    Q.    What is that a reference to?
 4    A.    That is a vanity name for the Lorenzo Johnson Facebook
 5    account.
 6    Q.    If I go farther down, is this the name that would appear
 7    when a user is interacting with Lorenzo Johnson's Facebook
 8    account?
 9    A.    That's correct.  That would be the display name on the
10    Facebook page.
11    Q.    Let's see if I can do it this way.  Yes.  I'm highlighting
12    a device type down here on the Lorenzo Johnson account.  What
13    device type is that?
14    A.    That is a Samsung Galaxy cellphone.
15    Q.    Is that the same model number that was used for the Ashley
16    Campbell communications?
17    A.    That is correct.  It is.
18    Q.    The same one referenced in Government Exhibit 2?
19    A.    Yes.
20    Q.    And next, I'm going to Exhibit 10.  If you'll bear with me
21    very quickly while I find the correct page.  I'm going to
22    highlight this entry right here.  What date is that?
23    A.    It is 10/16/2019 at 5:47 a.m. UTC time.
24    Q.    What's the action?
25    A.    I --
```

ANTHONY STACK - DIRECT

1   Q.   Where it says "action" on there, what does that mean?

2   A.   **Oh, I'm sorry.  That's for -- It's the IP address that was**

3   **associated with an attachment that was sent from the user of**

4   **the account.**

5        MR. TAVITAS:  Excuse me.  What page are you on,

6   again?

7        MR. PALOMO:  I'm now on page 25 of Government

8   Exhibit 10.

9        MR. TAVITAS:  Thank you, sir.

10        MR. PALOMO:  It's right down here at 5:47

11   (indicating).

12        MR. TAVITAS:  Thank you.

13   BY MR. PALOMO:

14   Q.   I'm going to highlight the IP address right here.  For

15   those first four numbers of the IP address, where have you seen

16   those numbers before?

17   A.   **That IP address is associated with the AT&T account that**

18   **belongs to the Lorenzo Johnson residence.**

19   Q.   And those would be the same numbers for the IP address in

20   Government Exhibit 18?

21   A.   **That's correct.**

22   Q.   Next, I'm going to show you Government Exhibit 12.

23        MR. PALOMO:  Your Honor, this has not yet been

24   admitted in evidence.

25        THE COURT:  Thank you.

1    BY MR. PALOMO:

2    Q.   What is Government's Exhibit 12?

3    A.   **These are Facebook messages found within the Lorenzo**

4    **Johnson Facebook account between Lorenzo Johnson and Jasmine**

5    **Stanley.**

6    Q.   And Government Exhibit 8, that business record

7    certification for the Lorenzo Johnson account, does this also

8    apply to Government Exhibit 12?

9    A.   **Yes, it does.**

10   Q.   And Government Exhibit 12, in a similar manner to the

11   other Facebook communications, has sub-exhibits.  Have you

12   reviewed those sub-exhibits?

13   A.   **Yes, I have.**

14   Q.   Are those fair and accurate representations of the content

15   in the messages?

16   A.   **Yes, they are.**

17   Q.   I will note again that the appearance of these messages is

18   not exactly the same as when you received it from Facebook?

19   A.   **That's correct.**

20   Q.   Is this also in that same format as the messages that we

21   reviewed earlier today?

22   A.   **Yes, they are.**

23        **MR. PALOMO:**  Your Honor, the Government moves to

24   admit Exhibit 12 into evidence.

25        **THE COURT:**  Any objection?

 1              MR. TAVITAS:  No, Your Honor.

 2              THE COURT:  All right.  Twelve is admitted.  I'll

 3     turn the screen on.

 4     BY MR. PALOMO:

 5     Q.   So instead of going through all the communications on this

 6     particular conversation, I'm going to direct your attention to

 7     the first page.  And what image is this that you see here?

 8     A.   **If you can bring it up just a little --**

 9     Q.   It's actually cut off at the bottom.

10     A.   **Oh, I'm sorry.  Yes.**

11     Q.   Have you seen that image before?

12     A.   **Yes, I have.**

13     Q.   Is this the same image found in 12A?

14     A.   **Yes, it is.**

15     Q.   And who is this?

16     A.   **This is Lorenzo Johnson.**

17     Q.   Do you recognize him in the courtroom today?

18     A.   **Yes (indicating).  He's sitting at defense counsel's table**

19     **in the white shirt.**

20              MR. PALOMO:  Let the record reflect the witness

21     identified the Defendant.

22              THE COURT:  Any objection?

23              MR. TAVITAS:  No, Your Honor.

24              THE COURT:  All right.  So identified.

25     Q.   Now, next, I'm going to go to a communication beginning at

1   8/27/2019, at 4:55 a.m.

2          MR. TAVITAS:  4:55?

3          MR. PALOMO:  4:55.

4          MR. TAVITAS:  Got it.

5   BY MR. PALOMO:

6   Q.   What is this image?

7   A.   **That is an image of an adult penis.**

8   Q.   I'm referencing Exhibit 12B next.  Is this that same

9   image?

10  A.   **Yes, it is.**

11  Q.   Which account were these images taken from?

12  A.   **This is from the Lorenzo Johnson Facebook account.**

13  Q.   I'm going to show you next Government Exhibit 4.  This is

14  the account that we just read from.  Who were the people

15  communicating in Government Exhibit 4?

16  A.   **It was Neci Taylor and the Ashley Campbell Facebook**

17  **account.**

18  Q.   Did the Ashley Campbell account just send that same image

19  that the Lorenzo Johnson account sent?

20  A.   **Yes.  Yes, she did.**

21  Q.   Next, I'm going to show the witness Government Exhibit 11,

22  which has not yet been admitted, Your Honor.

23       What is Government's Exhibit 11?

24  A.   **Those are Facebook messages between Lorenzo Johnson and**

25  **Neci Taylor that were taken from the Lorenzo Johnson's Facebook**

 1  **search warrant return.**

 2  Q.   And that previous business record certification,

 3  Government's Exhibit A, does that also apply to Government

 4  Exhibit 11?

 5  A.   **Yes, it does.**

 6  Q.   Same with the other exhibits that we've discussed today,

 7  this has sub-exhibits.  Have you reviewed those?

 8  A.   **Yes, I have.**

 9  Q.   Are those fair and accurate representations of the content

10  from the messages?

11  A.   **Yes, they are.**

12       **MR. PALOMO:**  Your Honor, the Government moves to

13  admit Government's Exhibit 11 into evidence.

14       **THE COURT:**  Any objection?

15       **MR. TAVITAS:**  No, Your Honor.

16       **THE COURT:**  All right.  It's admitted.  You can

17  display it.

18       **MR. PALOMO:**  Your Honor, request permission to

19  publish and also read in the same format that we did for the

20  Neci Taylor and Ashley Campbell communications.

21       **THE COURT:**  Proceed.

22  **BY MR. PALOMO:**

23  Q.   So, Officer Stack, if I could have you read as Neci

24  Taylor, and I'll read as Lorenzo Johnson.  If you could begin.

25  A.   *Say hi to your new Facebook friend, Neci.  Do I know you?*

ANTHONY STACK - DIRECT

```
 1   Q.    Maybe.

 2   A.    Maybe?

 3   Q.    You don't remember me, boo?

 4   A.    Not that I recall.

 5   Q.    Damn, okay.

 6   A.    Where you know me from?

 7   Q.    Never mind.

 8         You used to skate, but don't remember me.  You was almost

 9   my boo?

10   A.    I still skate, but I really don't anymore.

11   Q.    Oh, I used to come to Markham.

12   A.    On what day?

13   Q.    Tuesday, Fridays.

14   A.    I never been on Friday.

15   Q.    Okay.  Me and you used to talk.  And you don't remember?

16   You don't remember me?  Was the D that bad?

17   A.    LOL.

18   Q.    What does it mean, was the D that bad?

19   A.    I believe he's referencing "dick" for "D."

20   Q.    And what's Neci Taylor's reply?

21   A.    LOL.

22   Q.    That's tough.  LOL.  You gave me some good head too.  And

23   you as wet as hell.  I can't believe you don't remember.  You

24   don't remember?

25   A.    Kind of.
```

1    Q.    That's crazy.  It was a few years ago.  You gave me head

2    in the car.  How you don't remember?  You must been drunk LOL.

3    I guess you don't want to talk.  Maybe I should have keep our

4    video we made LOL.

5    A.    What video?

6    Q.    You gave me head in car.

7    A.    You must have me confused.

8    Q.    No.  We was at Markham, boo.  But I can refresh your

9    memory one day.  And there's an emoji and picture of a penis.

10          So I'm going to skip ahead now a couple pages beginning on

11   10/7/19 at 7:51 p.m.

12   A.    That's all you want to do is fuck me?

13   Q.    What do you want to be on?  I will do whatever you want.

14   Guess not.  It's a lady going around on FB with screenshot of

15   you talking about fucking little kids.  Did you know?

16          And when Lorenzo Johnson says "FB," what's that a

17   reference to?

18   A.    **Facebook.**

19   Q.    So he's saying it's a lady going around on Facebook with a

20   screenshot of you?

21   A.    **That's correct.**

22   Q.    What does Neci reply with?

23   A.    What?

24   Q.    And then Neci Taylor attempts to call Lorenzo Johnson.

25   I -- Call me on here.  And Neci again attempts to call Lorenzo

ANTHONY STACK - DIRECT

1    Johnson.

2    Q.    *I'm bowling.  What's up?*

3    A.    *Where did you see the comments at?*

4    Q.    *On some group.*

5    A.    *What group?*

6    Q.    *A white lady and IDK MF screenshot.  It's saying it's sick*

7    *people, and it was your Facebook.*

8          There's some acronyms in there.  Can you explain those

9    acronyms for the jury.

10   A.    **"IDK," I don't know.  "MF," motherfucker.**

11   Q.    So it's:  IDK, expletive, screenshot.  *It's saying it's*

12   *sick people, and it was your Facebook?*

13   A.    *That's correct.  Call me on here real quick so I can*

14   *explain it.*

15   Q.    *I'm bowling.  I can't.  You like younger guys and girls*

16   *though?*

17   A.    *No, I do not.  I'm not that type of person.  But I have a*

18   *case I'm doing against her because she is the one fuck like*

19   *kids that two, three years old, me messaging her back and fer*

20   *like that so I could get info out of her.  But now a detective*

21   *has access to my messenger, and he is communicating with her,*

22   *so she thinks she talking to me, but this bitch actually*

23   *talking to a cop.*

24   Q.    *Naw.  She has def info on you because a real cop was in*

25   *the group and investigating you.*

1   A.   *What group is this in?*
2   Q.   *She say she has a warrant and you will go to IJS.*
3        What does "IJS" mean?
4   A.   **I'm not --**
5   Q.   Any idea?
6   A.   **-- exactly sure what that acronym stands for.  I believe**
7   **he was saying she was going to jail, though.**
8   Q.   Just to pause quickly here.  There's reference to Lorenzo
9   Johnson being in contact with police officers.  Do you know
10  that to be true?
11  A.   **No.  We found no indication through our investigation that**
12  **Lorenzo Johnson was in contact with anyone from law enforcement**
13  **regarding these chats.**
14  Q.   Being a child exploitation investigator, is that
15  information that you would know?
16  A.   **That's what I'm -- We would uncover that for sure.  Yes.**
17  Q.   So resuming:  *I seen it was 10 pages of screenshots.*
18  A.   *They're investigating her.  She is the one doing child*
19  *pornography.*
20  Q.   *And I knew one of the officers that reposted.  That's how*
21  *I knew, her and you.*
22  A.   *What group is this in?  I need to know.*
23  Q.   So when Lorenzo Johnson says, *I knew one of the officers*
24  *that would repost it,* would a law enforcement officer ever post
25  child pornography?

ANTHONY STACK - DIRECT

```
 1              MR. TAVITAS:  Objection; speculation.

 2              THE COURT:  Sustained.

 3    BY MR. PALOMO:

 4    Q.   Is it common practice for investigators to post child

 5    pornography?

 6    A.   Absolutely not.

 7    Q.   So resuming, Neci Taylor says, What group?

 8         And the next response is:  And other because you agreed in

 9    messages.  She got, like, five people indicted.

10    A.   The cop knows the information on me agreeing with the

11    messages.

12    Q.   You don't have an investigator.  The police officer that I

13    know, I know in real life.  No, they don't.  I seen the case.

14    A.   How do you know this?

15    Q.   I know the officers, boo.  I covered for you, and you said

16    her page got hacked.  But I know girls in real life that mess

17    with her that really needed the money, so I know all about it.

18    Better to be honest with me at least.  I will cover for you.

19    A.   Can you push it down a little.

20         Appreciate it.  I am being honest.  I'm not into child

21    pornography.  Are you kidding me?

22    Q.   I hear you.  But I knew you a long time regardless.  I

23    still covered so they wouldn't fuck with you, but you might

24    want to block her.

25    A.   Okay.
```

1   Q.   So I'm going to fast-forward now to 11/10/2019, at

2   2:48 p.m.

3           MR. TAVITAS:   Just give me one second, please.

4   (Pause.)

5       Okay.  Thank you.

6   BY MR. PALOMO:

7   Q.   *You should trust me.  I never exposed that stuff with you*

8   *and them kids and all that shit Ashley mentioned.  I'm helping*

9   *you in a different way.*

10  A.   *Damn, what you threaten me now?  You better not say*

11  *anything.  That was some private shit.*

12  Q.   *I won't, and no, I'm not just say you should at least*

13  *trust me.  Ain't like you losin'.  You gainin'.  Just don't try*

14  *and play me.  What's your phone number?*

15  A.   *I ain't playin' you.  If Imma do it, then I got you.  Me*

16  *and my nieces going to breakfast.  I hit you up later.*

17  Q.   *Oh, no.  You playing.  See, you make me want to expose you*

18  *too.  I don't have time for games.  I need to get this*

19  *done now.*

20  A.   *Damn.  What I got to jump for you now?  You ain't my man.*

21  Q.   *Do you know, man, what you was inboxed about fucking and*

22  *sucking on kids sending your nudes and shit?*

23  A.   *I told you that was some private shit.  Ain't none his*

24  *business.*

25  Q.   *And you escaped.  I could have told and printed that shit,*

1    *showed everybody at 87th when you was just up there.  You*

2    *could be in jail, but now you want to play when I'm trying to*

3    *put you on.*

4    A.   *I didn't touch no kids.  That was Ashley.  All I did was*

5    *talk.  You can't get in trouble for that.*

6    Q.   *Are you crazy?  You're accepting doing sexually shit to*

7    *minors for money.  Same way the prostitutes go to jail for just*

8    *saying they will have sex for money.*

9    A.   *But ain't did nothing, and I ain't got paid.  She was*

10   *playing me.*

11   Q.   *I told you my buddy was law enforcement.  I'm not on that,*

12   *though.  But don't make me mad trying to play.*

13   A.   *I don't think she really had kids anyways or anything like*

14   *that.*

15   Q.   *Let me put this money in your account.  And send me mines.*

16         And then Lorenzo Johnson sends an image.  I'm going to

17   Government Exhibit 11G.  Is this that same image?

18   A.   **Yes, it is.**

19   Q.   Where have you seen that image before?

20   A.   **That was from the Ashley Campbell Facebook search warrant**

21   **return.  It was messages between the Ashley Campbell account**

22   **and the Neci Taylor account.**

23   Q.   So Lorenzo Johnson is sending a screenshot of a

24   conversation from the Ashley Campbell account to the same lady

25   that he's communicating with?

ANTHONY STACK - DIRECT

1    A.   **That's correct.**

2    Q.   Lorenzo Johnson resumes:  *I got you all convos.*

3    A.   *Yeah.  So maybe I'm a freak but it never happened.*

4    Q.   *Yeah.  You definitely a freak, but I need to transfer this*

5    *money, and you playing.*

6    A.   *I told I'm going to Mickey D's with my nieces right now.*

7    Q.   What's Mickey D's?

8    A.   **McDonald's.**

9    Q.   Lorenzo Johnson:  *I'm not waiting.*

10   A.   *I don't know if I can trust you since you keep throwing*

11   *that Ashley shit in my face.*

12   Q.   *You can send me the info now so I can do it, or we just*

13   *going to have problems.*

14   A.   *You steady going to keep threatening me every time I don't*

15   *do what you want.*

16   Q.   *Send the user name and password.  You got two minutes.*

17   A.   *See?  Threats.  And you want me to trust you?*

18   Q.   *Like I said, you got two minutes, little freaky.*

19   A.   *I'm going to Micky D's.  I hit you up later.  See if you*

20   *off this crazy shit.*

21   Q.   *Okay.  I see you think I'm a game.  Say less.  Watch this.*

22   *Done playing.*

23        What's this image that Lorenzo Johnson sent?

24   A.   **Lorenzo Johnson sends a screenshot of -- Those are friends**

25   **that they have mutually in common.  So friends that Lorenzo**

ANTHONY STACK - DIRECT

1    **would have and friends that Neci Taylor would have.**

2    Q.   *Bunch of your skating people who need to know all about*

3    *you.   Bye now.*

4    A.   *Please don't send anything out.   I'm begging you.*

5    Q.   *Nah, you playing with me.*

6    A.   *I don't have Chase or TCF or anything.   I was only saying*

7    *that because I liked you.*

8    Q.   Chase and TCF, what are those?

9    A.   **Those are bank accounts.**

10   Q.   Lorenzo Johnson says:  *You full of shit.   Don't ever lie*

11   *to me.   You put yourself in worse shit.*

12   A.   *Only bank I got is the currency exchange.   Sorry.*

13   Q.   *If you like me, say that.   If you got a sex addiction,*

14   *cool.   I know you freaky and like kids.*

15   A.   *Yeah, but that's a secret.   And please don't be treating*

16   *me about okay?   Threatening.*

17   Q.   *Well, what you going to do for me, then?*

18   A.   *Haha.   Well, right now I'm going to Mickey D's, so I hit*

19   *you up later, okay.*

20   Q.   *Send me your pussy right now.   And why you acting like you*

21   *didn't remember giving me head at Markham?*

22   A.   *I'm with my little nieces, and we walking out the door.*

23   Q.   *How old is she?*

24   A.   *It's two, and they four and five.*

25   Q.   *And what's this emoji that he sends here?   Let me see if I*

1    can zoom in on that a bit more.  What's that emoji?

2    A.   **It's an emoji of someone doing this (indicating) where**

3    **they're thinking, it looks like.**

4    Q.   Lorenzo Johnson removed a message and then said:  *I don't*

5    *believe you.*

6    A.   *I told you I hit you up later.  I told you you ain't my*

7    *man.  Stop treating me like it.*

8    Q.   *Fuck it.  I'm sending these screenshots.  Enjoy your life.*

9    A.   *Do what you want.  But I ain't gonna be scared because you*

10   *gonna threaten me with this shit.  I thought you was cool.*

11   Q.   So if we're to back up to these messages where Lorenzo

12   Johnson is talking about exposing Neci Taylor, who is typing as

13   Neci Taylor?

14   A.   **That would be me.**

15   Q.   So if we go back beginning at November 10th, 2019, at

16   2:49 p.m., is that you communicating as Neci Taylor?

17   A.   **Yes, it is.**

18   Q.   The part about the police, who was typing as Neci?

19   A.   **That was me, as well.**

20   Q.   Why did you ask those questions?

21   A.   **Can you go back to where it was again?  I'm sorry.**

22   Q.   So this would be beginning on November 10th?  Where he

23   references, *I told you my buddy is law enforcement.*

24   A.   **Mm-hmm.**

25   Q.   Were you typing as Neci Taylor after that?

ANTHONY STACK - DIRECT

1    A.    **I was.**

2    Q.    Last couple questions about your activity on that account.

3          Can you explain why you were communicating as Neci Taylor

4    with Lorenzo Johnson?

5    A.    **Lorenzo Johnson initiated contact with Neci Taylor**

6    **regarding the Ashley Campbell account, and then Neci Taylor**

7    **then contacted me and told me about that conversation.  So then**

8    **she granted me consent to then communicate with Lorenzo Johnson**

9    **as her using the Neci Taylor account.**

10   Q.    And at that point, why did you want to communicate with

11   the Lorenzo Johnson account?

12   A.    **Because at that point it was clear that we hadn't**

13   **completely identified the Ashley Campbell user yet, and Lorenzo**

14   **Johnson had direct information regarding that account, so we**

15   **wanted to know what he knew about that account.**

16         **MR. PALOMO:**  Officer Stack, I have no further

17   questions of you.  I have no further questions, Your Honor.

18         **THE COURT:**  Okay.  Thank you.

19         Ladies and gentlemen, I'm expecting, you know, a somewhat

20   lengthy cross-examination of this witness.  It's been a long

21   day with the jury selection.  So we're just going to cut off

22   early today so it gives Mr. Tavitas a chance to prepare his

23   cross-examination of this witness.

24         I'm being told, in all likelihood, the trial is going to

25   be shorter than what I was anticipating, so we're not sort of

ANTHONY STACK - DIRECT

1   chewing into any of your time.  I will have more information by

2   the end of the day tomorrow to give you a little more

3   specificity on that.  But, for now, I appreciate your

4   attentiveness.

5       I want to reiterate the admonitions I've been giving you.

6   Don't discuss the case amongst yourselves.  Don't go home, talk

7   to anybody at all about the case.  Don't do any outside reading

8   on the case.  And, of course, you have to continue to keep an

9   open mind until you've heard all of the evidence.

10      So, with that, I have a hearing at 8:30 in the morning in

11  a different case.  That's going to take about a half-hour.  So

12  if you could be here by about ten to 9:00, no later than that,

13  so that we could try to promptly start at 9:00.  We'll have

14  some coffee and rolls here for you, and we'll try to start

15  right at 9:00.  So I look forward to seeing you here in the

16  morning, and drive safely.

17      You can follow Shane back to the jury room.

18      (Jury out at 4:15 p.m.)

19          **THE COURT:**  You may be seated.

20      Officer Stack, if you wouldn't mind being back here about

21  the same time, ten to 9:00 tomorrow.

22          **THE WITNESS:**  Yes, Your Honor.

23          **THE COURT:**  We'll pick up at that time.

24      Anything else we need to talk about at this point?

25  Anything from you, Mr. Palomo or Ms. Kelley?

ANTHONY STACK - DIRECT

```
 1              MR. PALOMO:  Not from the Government, Your Honor.

 2              THE COURT:  Mr. Tavitas, how about from your

 3    perspective?

 4              MR. TAVITAS:  No, Your Honor.

 5              THE COURT:  Okay.  We'll see you in the morning.

 6         (Court adjourned at 4:16 p.m.)

 7                      CERTIFICATE OF REPORTER

 8              I, Angela Phipps, RMR, CRR, CSR, certify that the

 9    foregoing is a true, complete, and accurate transcript from the

10    record of proceedings in the above-entitled matter before the

11    Honorable Philip P. Simon, on August 11, 2021.

12

13    Date:  March 10, 2022        S/Angela Phipps, RMR, CRR
                                   Official Court Reporter
14                                 for the U.S. District Court

15

16

17

18

19

20

21

22

23

24

25
```